# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDRE BLAND, URSHAWN MILLER, HOWARD HAWK WILLIS, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, and FEDRAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE, | |
| *Plaintiffs,* | |
| v. | Case No: __1:25- cv-3499____ |
| PAMELA J. BONDI, in her official government capacity, and the UNITED STATES DEPARTMENT OF JUSTICE. | |
| *Defendants.* | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*(Chapter 154 of Title 28 and unconstitutional transfer of judicial authority to a biased decision maker to certify a state postconviction counsel mechanism)*

## INTRODUCTION

1. Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2261, *et seq*., establishes a *quid pro quo* arrangement: a State provides indigent defendants sentenced to death with a mechanism for competent post-conviction counsel and adequate litigation expenses in exchange for special expedited and narrowed federal habeas review by Article III courts. To apply the fast-track procedures for federal habeas review in Chapter 154, a State must meet the requirements for an adequate post-conviction counsel mechanism in capital cases. 28 U.S.C. § 2265. Originally, under AEDPA, federal courts conducting habeas review decided whether a State was eligible for the expedited procedures because the State met Chapter 154's requirements. Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996). In 2006, Congress expressed frustration over judicial determinations that States did not meet Chapter 154's requirements.[1] It transferred decision-making authority from Article III courts to the Attorney General and authorized the Attorney General to "certify" that a State satisfies Chapter 154. *See* USA PATRIOT Improvement and Reauthorization Act of 2005 ("Reauthorization Act"), Pub. L. No. 109-177, § 507(c)(1). It further seeks to make the Attorney General's certification decision for a given state binding on Article III courts considering the federal habeas petitions of individual death-sentenced prisoners of the same state.

---

[1] As DOJ explained, "The 2006 amendments reflected a legislative judgment that the Attorney General and the D.C. Circuit would best be able to make disinterested determinations regarding state counsel systems' satisfaction of chapter 154 . . . [and] reflect[ed] congressional concern that some courts had declined to apply chapter 154 on grounds going beyond those Congress had deemed to be warranted in its formulation of chapter 154, *see* 152 Cong. Rec. 2441, 2445-46 (2006) (remarks of Sen. Kyl); 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extension of remarks of Rep. Flake)." Certification of Arizona Capital Counsel Mechanism, 85 Fed. Reg. 20,705, 20,706-07 (Apr. 14, 2020).

2. On August 7, 2025, the Department Justice ("DOJ"), Office of Legal Policy ("OLP"), published the State of Tennessee's request, dated June 6, 2025, for certification of its capital counsel mechanism. The state asserts that its assigned counsel mechanisms satisfied Chapter 154's requirements as of October 23, 1995. Tennessee did not provide any additional information or materials to document how its mechanism actually operated in practice. 26 C.F.R. § 26.23(b) (requiring publication of "supporting materials"). OLP gave notice that public comments regarding this request must be submitted by October 6, 2025.

3. The transfer of decision-making authority from Article III courts to the Attorney General, an Article I executive branch official, under 28 U.S.C. § 2265, violates the constitutional mandates of due process and separation of powers. The Supreme Court has long established that the Due Process Clause of the Fifth Amendment requires an impartial, uninterested, and independent decision maker when individual rights are at issue, and that the separation of powers doctrine protects the tripartite system of government in the Constitution, including safeguarding the powers and duties of Article III courts.

4. Neither Chapter 154 nor any other federal law affords those most affected by a certification grant and most knowledgeable of unfilled promises in the state's paper application— the condemned prisoners seeking federal habeas review and their attorneys—any individual status in the process. Despite their life-and-death interests, and their superior knowledge, their only option is to submit public comment, along with any other interested members of the public. Any failure to do so would deprive the Attorney General, and later the D.C. Circuit Court of Appeals, of the administrative records required to decide the application, beyond Tennessee's bare assurances that it has provided an adequate system of defense.

5. These circumstances have forced Plaintiffs to make a choice: invest in participating in the certification process or risk their ability to pursue their claims on judicial review of the certification decision. Specifically, the individual Plaintiffs could choose to have their counsel invest extraordinary time and resources to submit public comments that create the administrative record in support of their substantive challenges to the certification application, then exhaust the administrative process, and finally seek judicial review of their claims in the U.S. Court of Appeals for the D.C. Circuit. This burden has been explained by requests for extensions submitted by the individual Plaintiffs' counsel as well as Plaintiff the Federal Defender Service for Eastern Tennessee. Only after this exercise in futility to exhaust an unconstitutional administrative process before an unconstitutionally biased decision maker, could Plaintiffs then raise their collateral constitutional challenges before an Article III court, along with their substantive challenges to a certification decision. *See* 28 U.S.C. § 2265(c); Ch. 158 of Title 28. Alternatively, Plaintiffs could forgo expending the time and resources to develop and submit public comments but would face the substantial risk that a biased decision maker will create an inadequate administrative record. Even with *de novo* review in the Court of Appeals, the Plaintiffs cannot be guaranteed the opportunity to develop the record for their substantive challenges to the Attorney General's decision should their constitutional claims be unsuccessful. Nor would *de novo* review alleviate Plaintiffs' frustration with the absurdity of the nation's highest *prosecutor*—an unconstitutionally biased decision maker—determining whether the particulars of a state postconviction counsel mechanism afforded them an adequate *defense* sufficient to justify restrictions on their right to federal habeas review, a proceeding that itself falls squarely within the federal district court's authority under Article III. Plaintiffs cannot accept the certification regime's biased process, which

vests the Attorney General with vast discretion, in violation of both the due process and separation of powers guarantees of the U.S. Constitution.

6. The Due Process Clause of the Fifth Amendment requires the neutrality of an unbiased and disinterested government decision maker, which is violated when an adjudicator has substantial interest in the outcome of a case, including the interest arising from an official's executive responsibilities. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980); *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 60 (1972); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). Fairness issues are also at their apex when a federal court reviews the process requisite to the taking of a human life by the state. *See*, *e.g.*, *Lambright v. Stewart*, 191 F.3d 1181, 1188 (9th Cir. 1999) (due process demands a "higher degree of procedural regularity and reliability in capital cases"). Further, it is well-established that this fairness requirement applies not only to courts, but to administrative agencies. *Withrow v. Larkin*, 421 U.S. 35, 46-7 (1975). While involvement of an actually biased decision maker violates due process rights, "our system of law has always endeavored to prevent even the probability of unfairness." *Id*. at 47 (holding in the context of administrative adjudication that the presumption of probit in favor of adjudicators is overcome when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" (citing *Tumey* and *Ward*)). Thus, the violation of due process is established "not just on actual bias, but on circumstances that could create a significant risk of actual bias." *Wildberger v. Am. Fed'n of Gov't Employees, AFL-CIO*, 86 F.3d 1188, 1196 (D.C. Cir. 1996); *see also In re Murchison*, 349 U.S. 133, 136 (1955). A due process claim for such probable unfairness is established when a plaintiff demonstrates that the "risk of unfairness is intolerably high" under the circumstances of the particular case. *Withrow*, 421 U.S. at 58. Accordingly, the determination of a State's certification application—the required step before the

truncated procedures under Chapter 154 of Title 28 are applied and the State's taking of a human life is expedited—must be free of institutional bias or a significant risk of it. The Attorney General, as the government's chief prosecutor and law enforcement officer, has demonstrated both an actual institutional bias in favor of expediting capital prosecutions and executions, and a clear, substantial risk of bias. When the decision maker is biased, as the Attorney General is here, the process violates the Due Process Clause.

7. Article III, § 1 of the U.S. Constitution vests the judicial power in the federal courts, and federal habeas review resides at its heart. Legal and other sources show that "the right … to claim the benefit of the writ of habeas corpus," *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823), is among the "rights of the citizen guaranteed by the Federal Constitution." *Slaughter-House*, 83 U.S. 36, 79 (1872) (citing *Corfield*). Congress passed the Habeas Corpus Act of 1867 (HCA) with the understanding that such legislation would define the habeas privilege protected by the Suspension Clause. *Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101-02 (1868); *Ex parte Royall*, 117 U.S. 241, 247-48 (1886); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807); *see also* Jordan Steiker, *Incorporating the Suspension Clause: Is There A Constitutional Right to Federal Habeas Corpus for State Prisoners?*, 92 Mich. L. Rev. 862, 888 (1994) (explaining how "the [Supreme] Court cast habeas as an affirmative individual right of constitutional dimension").

8. Once Congress grants the federal courts jurisdiction—as it has in the federal habeas context—it cannot encroach on the judiciary's power to interpret the law and decide the cases and controversies that arise under it. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997). In transferring to the Attorney General the authority under § 2265 to decide that a State qualifies for expedited procedures, Chapter 154 seeks to bind Article III courts conducting federal habeas review to the certification determination. Simply put, § 2265 authorizes the Attorney General to

make an aggregate decision on the State's eligibility to employ expedited procedures and a narrowed scope of review in individual habeas cases, encroaching upon the federal court's core role in deciding petitions for habeas review on a case-by-case basis. This contravenes Article III, § 1.

9. Finally, while either of these constitutional violations, standing alone, requires this court to declare 28 U.S.C. § 2265 unconstitutional, considered together, the constitutional infirmities aggrandize the Attorney General's power in a manner that flouts the protections and structure of the Constitution. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990) (recognizing prior decisions where conduct was found to be a constitutional violation when constitutional protections were viewed in connection with one another (citing cases)), *superseded by statute*, 42 U.S.C. § 2000bb *et seq.*

10. In sum, the certification process under § 2265 violates both Article III, § 1 of the U.S. Constitution and the procedural due process clause of the Fifth Amendment.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this action under Article III of the Constitution and 28 U.S.C. §1331 (federal question) because Plaintiffs' purely legal claims assert facial challenges arising under the Constitution. *See Axon Enterprise v. Federal Trade Commission*, 598 U.S. 175 (2023) (holding alternative review scheme does not divest a district court of jurisdiction over a constitutional challenge to an agency's decision-making structure); *Free Enterprise Fund v. Public Company Oversight Bd.*, 561 U.S. 477 (2010) (applying the factors in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to hold that the district court had jurisdiction under § 1331 to hear a constitutional separation of powers challenge to the structure of the Public Company Accounting Oversight Board); *see also Medina v. Nat'l Labor Relations Bd.*, 2025 WL 1988096 (D.D.C. Slip

Op. July 17, 2025) (finding subject matter jurisdiction under § 1331 despite the availability of proceedings under the National Labor Relations Board because "[f]airness dictates that if it can be avoided, plaintiff should not have to choose between redressing his injury in an unconstitutional forum and not redressing his injury at all").

12. Venue is appropriate in the District Court for the District of Columbia under 28 U.S.C. §1391(e) because Defendants' acts giving rise to the claims occurred in this District, and the Defendants are headquartered in this District.

PARTIES

**<u>Plaintiffs</u>**

13. **Plaintiff Andre Bland**, age 52, was sentenced to death in 1994 at the Shelby County Criminal Court in Memphis, Tennessee. Private counsel Bret Stein and Wayne Chastain were originally appointed to represent him in his initial state post-conviction proceedings. Then the Office of the Post-Conviction Defender for Tennessee ("OPCD") was appointed and private counsel was removed. Finally, OPCD was removed and private counsel Michael Scholl and Marty McAfee were appointed. Currently, Mr. Bland's federal habeas petition is stayed while he pursues relief on his intellectual disability claim, along with his challenge to Tennessee's amended statute, Tennessee Code Annotated 39-13-203 (2021). Mr. Bland is represented by the Office of the Federal Defender for the Middle District of Tennessee ("MDTN") in his federal habeas/state-exhaustion proceedings.

14. **Plaintiff Urshawn Miller**, age 36, was sentenced to death in 2018 in the Circuit Court for Madison County, Tennessee. His conviction and death sentence were affirmed on appeal by the Tennessee Supreme Court in 2021. Currently, Mr. Miller is represented in his state post-conviction proceedings by the OPCD.

15. **Plaintiff Howard Hawk Willis**, age 74, was sentenced to death in 2010 in the Circuit Court for Washington County, Tennessee. He was represented by Josh Hedrick and Cullen Wojcik in his state post-conviction proceedings. Currently, Mr. Willis's federal habeas petition is being investigated and prepared by the Capital Habeas Unit of the Federal Defender Services of Eastern Tennessee, Inc.

16. **Plaintiff Federal Defender Services of Eastern Tennessee, Inc., ("FDSET")** operates as the federal public defender in the Eastern District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g). FDSET includes a Capital Habeas Unit ("CHU"), which is appointed to capital habeas cases arising from the Eastern District of Tennessee and nine other federal districts across the country. Currently, the CHU represents six inmates on Tennessee's death row whose cases could be affected if Tennessee were to receive certification.

17. **Plaintiff Federal Public Defender for the Middle District of Tennessee ("TNM-CHU")** operates as the federal public defender in the Middle District of Tennessee pursuant to 18 U.S.C. § 3006(A)(g), and includes the Capital Habeas Unit ("CHU") that is appointed as counsel for 21 of the 42 individuals currently on death row in Tennessee.

**Defendants**

18. **Defendant Pamela J. Bondi** is the Attorney General of the United States. She oversees the U.S. Department of Justice ("DOJ"), including the Office of Legal Policy ("OLP"), and asserts the purported authority under 28 U.S.C. § 2265 to determine that a state is certified under 28 U.S.C. § 2265(a) and eligible for the expedited and narrowed federal habeas review procedures under 28 U.S.C. § 2261.

19. **Defendant DOJ** promulgated the regulations to implement the Attorney General's certification procedures. 28 C.F.R. §§ 26.20-26.23; Certification Process for State Capital Counsel

System, 78 Fed. Reg. 58,160 *et seq*. Attorney General Bondi directed the OLP to manage the application and review process set forth in the regulation, including managing the notice and public comment period, and preparing a recommendation and draft decision for the Attorney General regarding each State's certification application.

**FACTS**

20. On August 7, 2025, the Office of Legal Policy (OLP) published an application from Tennessee seeking the Attorney General's certification under Chapter 154 of its mechanism for providing post-conviction assigned counsel, effective as of October 23, 1995. The deadline for submissions of public comments on the application is October 6, 2025. There is no deadline for the Attorney General's certification decision, and the Attorney General may publish "subsequent notice[s]" for further opportunity to comment before deciding the application. 28 C.F.R. § 26.23(c).

## A.    Chapter 154 limits important rights otherwise guaranteed to federal habeas petitioners

21. Congress enacted Chapter 154 as part of AEDPA to provide a "quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants." H.R. Rep. No. 104-23, at 10 (1995). To be certified as an "opt-in" State, a State must meet the requirements of Chapter 154 to provide individuals sentenced to death with competent, adequately compensated, and properly resourced state postconviction counsel. Once certified, a State is entitled to assert Chapter 154's restricted procedures for federal habeas review. These include:

    a.    a shorter of statute of limitations of 180 days instead of 1 year, 28 U.S.C. § 2263(a);

    b.     more limited grounds for tolling of the statute of limitations, *id.* § 2263(b);

10

c. restrictions on the ability to file an amended habeas petition, *id.* § 2266(b)(3)(B);

d. prioritizing the adjudication of petitions subject to Chapter 154 in the federal district court and court of appeals over all non-capital matters, *id.* § 2266(a);

e. requiring a federal district court to enter final judgment on a habeas petition within 450 days of the filing of the petition, or 60 days after it is submitted for decision, whichever is earlier, *id.* § 2266(b);

f. requiring the court of appeals to render a final determination of any appeal within 120 days of filing of a reply or answering brief, *id.* 2266(c); and

g. allowing the State to "enforce a time limitation" by petitioning for a writ of mandamus to a higher court. *id.* § 2266(b)(4)(B), (c)(4)(B).[2]

22. If certified, a States may assert it is entitled to these provisions retroactively to the date the Attorney General finds the State's assigned counsel mechanism satisfied the requirements of Chapter 154. *See id.* § 2265(a)(2).

23. In States that are not certified under Chapter 154, the structure of Chapter 153 of Title 28 is applicable to federal habeas review for individuals with state death sentences. The two chapters create a dual system with the presumption that petitions will be adjudicated under Chapter 153 unless the requirements of Chapter 154 are satisfied.

---

[2] Finally, § 2266 requires the Administrative Office of the United States Courts to submit to Congress an annual report on the compliance by the courts with the time limitations. 28 U.S.C. § 2266(b)(5)(A); *id.* § 2266(c)(5). Annual reports concerning district courts must further include any order allowing for a delay. *Id.* § 2266(b)(1)(C)(iv).

24. Chapter 153 confers important rights, protections, and expectations that are taken away by certification under Chapter 154 and application of its expedited procedures. The Supreme Court has recognized that because the application of Chapter 154 changes "standards of proof and persuasion in a way favorable to a State, the statute goes beyond 'mere' procedure to affect substantive entitlement to relief." *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). As Congress clearly contemplated that such a change would occur only if the predicates for the application of Chapter 154—that is the requirement of the appointment of adequately-compensated, competent counsel who benefited from the payment of reasonable litigation expenses in state post-conviction—were met, due process must accompany that determination. Because the determination of Chapter 154's applicability affects a petitioner's "substantive entitlement to relief," and because that relief would ultimately be predicated on a petitioner's unconstitutional conviction or sentence, the determination implicates important liberty and, in capital cases, life interests that due process safeguards.

**B.      The Reauthorization Act Transferred Certification Authority from Federal Courts to the Attorney General**

25.   When Congress originally adopted AEDPA, Chapter 154 did not assign any authority to the Attorney General. Instead, the statute made expedited procedures available to state respondents if *a federal court* found that "the State establish[d] by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings . . . ." Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996).

26. Following the enactment of AEDPA, the federal courts found or observed in twenty-five[3] states that the governments were not entitled to apply the expedited procedures under Chapter 154 against individuals seeking federal habeas review of their death sentences. The federal courts concluded (or states acknowledged) that the mechanisms did not satisfy the requirements of Chapter 154 to ensure that qualified counsel and sufficient resources were provided to the petitioners to develop and pursue claims in state post-conviction proceedings[4] or found it

---

[3] Alabama, Arizona, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington.

[4] *See, e.g., Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000) (Maryland), *cert. denied*, 531 U.S. 1193 (2001); *Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) (Texas); *Ashmus v. Woodford*, 202 F.3d 1160 (9th Cir. 2000) (California), *cert. denied*, 531 U.S. 916 (2000); *Sexton v. French*, 163 F.3d 874 (4th Cir. 1998*), cert. denied*, 528 U.S. 855 (1999); *Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir. 1998); *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) (Tennessee), *cert. denied*, 523 U.S. 1079 (1998); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (Oklahoma); *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1997) (Montana); *Death Row Prisoners of Pa. v. Ridge*, 106 F.3d 35 (3rd Cir. 1997) (Pennsylvania); *Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996), *amended and superceded by* 130 F. 3d 782 (7th Cir. 1997); *Carter v. Friel*, No. 2:02CV326TS, 2005 WL 1683689 (D. Utah July 18, 2005); *Palmer v. Clarke*, 293 F. Supp. 2d 1011 (D. Neb. 2003), *rev'd in part on other grounds by* 408 F.3d 423 (8th Cir. 2005); *Brown v. Puckett*, 2003 WL 21018627 (N.D. Miss. 2003); *Noel v. Norris*, 194 F. Supp. 2d 893, n.47 (E.D. Ark. 2002); Order, *Brown v. Lambert*, No. C01-715C (W.D. Wash. Sept. 6, 2001); *Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998), *aff'd*, 215 F.3d 1116 (10th Cir.), *cert. denied*, 531 U.S. 1055 (2000); *Mills v. Anderson*, 961 F. Supp. 198 (S.D. Ohio 1997); *Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997); *Wright v Angelone*, 944 F. Supp. 460 (E.D. Va. 1996); *Hill v. Butterworth*, 941 F. Supp. 1129 (N.D. Fla. 1996) (Florida), *rev'd for lack of a case or controversy*, 147 F.3d 1333 (11th Cir. 1998); *Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996), *rev'd on other grounds*, 125 F.3d 269 (5th Cir. 1997), *cert. denied*, 525 U.S. 859 (1998); *Martinez High v. Turpin*, 14 F. Supp. 2d 1358, 1365 n.6 (S.D. Ga. 1998), *aff'd* 209 F.3d 1257 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001); *see also Bell v. Haley*, 437 F. Supp. 2d 1278, 1280 (M.D. Ala. 2005) (noting the state's response to the court that "no court has ruled that Alabama has satisfied the opt-in provisions"); *Leavitt v. Arave*, 927 F. Supp. 394, 396 (D. Idaho 1996) ("[T]he court does not understand either party to argue that at the time of the petitioner's state proceedings the State of Idaho had in place procedures sufficient to meet the requirements of the new chapter 154.").

unnecessary to evaluate the mechanism at all because it would not have been applicable in the petitioner's case.[5]

27. Subsequently, members of Congress expressed their dissatisfaction with the judicial determinations that states did not qualify for the expedited procedures for federal habeas review of capital sentences, and Congress amended Chapter 154.[6] Some members of Congress asserted that federal courts were unable to be "disinterested" because applying the expedited procedures under Chapter 154 would affect their deadlines and workload, and these members asserted that the Attorney General could be a disinterested decision maker.[7] Despite courts' reasoned rulings about whether states were entitled to the opt-in provisions, Congress removed from the federal courts the power to determine whether a state could invoke the expedited review

---

[5] *See, e.g., Tucker v. Catoe*, 221 F.3d 600 (4th Cir.), *cert. denied*, 531 U.S. 1054 (2000); *Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000), *cert. denied*, 534 U.S. 863 (2001). In *Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002), the Court found that Arizona's *prior* postconviction capital counsel mechanism satisfied the requirements of Chapter 154 but that expedited procedures would not apply in petitioner's case because Arizona did not appoint postconviction counsel for him in conformity with its mechanism. Arizona's mechanism has since been revised.

[6] *See, e.g.*, 152 Cong. Rec. S1598, 1620-28, 1621, 1625 (Mar. 2, 2006) (statement of Sen. Kyl) (criticizing the "Federal habeas system" and declaring that what victims and their families "have experienced at the hands of the Federal courts should offend every American" and explaining that "ADEPA left the decision of whether a State qualified for the incentive to the same courts that were impacted by the time limits. This has proven to be a mistake"); 151 Cong. Rec. E2639-40, E2639 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 (stating that the Reauthorization Act § 507(c)(1) "gives States a real chance to qualify for chapter 154 treatment" and, with respect to why the Arizona had not qualified for chapter 154 procedures, stated that "The problem is simple: under current law, the local Federal court of appeals decides whether a State has opted in to chapter 154").

[7] *See, e.g.*, 151 Cong. Rec. E2639-40, E2640 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 ("The trouble with chapter 154 is that the courts assigned to decide when it applies are the same courts that would be bound by the chapter's strict deadlines if a State is found to qualify. Simply put, the regional courts of appeals have a conflict of interest. They decide whether the States are entitled to a benefit which places a burden on the courts themselves.").

procedures, transferring that authority to the Attorney General, who now possesses the power to certify that jurisdictions qualify. *See* Reauthorization Act, § 507(c)(1).

28. The Attorney General's certification is a necessary prerequisite decision to a habeas court's determination in an individual case that the state's mechanism proposed applied in that case. *See* 28 U.S.C. § 2261(b)(1). Under the amended scheme, the Attorney General determines "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought by indigent [capital] prisoners," "the date on which the mechanism" was established, and whether the State "provides standards of competency for the appointment of counsel in [these] proceedings." *id.* § 2265(a)(1).

29. Chapter 154 also authorizes the Attorney General to "promulgate regulations to implement the certification procedure," which included defining key provisions such as "competent counsel," "reasonable resources," and "adequate" litigation resources. 28 U.S.C. § 2265(b). Chapter 154 purports to bind federal courts by preventing a federal court in an individual case from reviewing any of those determinations respecting the state's mechanism.

30. Chapter 154 created a path for the judicial review of an Attorney General's decision to certify a state. It grants the Court of Appeals for the D.C. Circuit "exclusive jurisdiction" to review the determination. 28 U.S.C. § 2265(c)(2). Review is governed by the Hobbs Administrative Orders Review Act, Chapter 158 of Title 28. *See id.* § 2265(c)(1). The applicable standard of review is *de novo*. *See id.* § 2265(c)(3). That Court's judgment is appealable to the U.S. Supreme Court. *See id.* § 2265(c)(2); *id.* § 2350(a).

31. Prior to 2025 (and prior to the effective date of the 2013 Final Rule), only two states, Texas and Arizona, had submitted applications for certification to the Attorney General. Neither state is certified.

32. On November 16, 2017, the DOJ published in the Federal Register a notice that Arizona had submitted applications for Chapter 154. 82 Fed. Reg. 53,529 (Nov. 16, 2017). During the public comment period for Arizona's application, DOJ received 140 comments opposing certification. *See* DOJ Docket ID DOJ-OLP-2017-0009, at https://www.regulations.gov/docket/DOJ-OLP-2017-0009 (last visited Sept. 23, 2025). The Federal Public Defender for the District of Arizona supported its opposition with twenty exhibits demonstrating the deficiencies in the Arizona mechanism. The Attorney General briefly certified Arizona's capital counsel mechanism, *see* 85 Fed. Reg. 20705 (April 4, 2020). While a Petition for Review was pending in the Court of Appeals, the Court granted DOJ's request for a voluntary remand to obtain additional information about the operation of the state's mechanism. Arizona did not provide some of the additional information requested by the Attorney General. The Attorney General rescinded its prior approval and denied Arizona's application after not receiving the requested information. *See* Letter from the Acting Assistant Attorney Geneal to Attorney General of Arizona, January 17, 2025, *available at* https://www.justice.gov/olp/media/1385496/dl (last visited Sept. 25, 2025).

33. On November 16, 2017, the DOJ published a notice in the Federal Register advising the public of Texas's certification request and initiating a sixty-day public comment period. Notice of Request for Certification of Texas Capital Counsel Mechanism, 82 Fed. Reg. 53,530 (Nov. 16, 2017). In response to the initial application and a subsequent update, DOJ received 46 public comments, the most extensive of which was a 247-page comment submitted by the Texas Defender

Offices and supported by 134 exhibits. *See* DOJ Docket ID DOJ-OLP-2017-0010, *available at* https://www.regulations.gov/docket/DOJ-OLP-2017-0010 (last visited Sept. 25, 2025). After review, on June 19, 2018, DOJ sought further information from Texas regarding its effective date; counsel fees and expenses; and its standards of competency. *See* Letter from Office of the Assistant Attorney General to the Attorney General of Texas, June 19, 2025, *available at* *https://www.justice.gov/olp/page/file/1073361/dl?inline* (last visited Sept. 25, 2025). Texas has not responded, and the Attorney General has allowed the application to remain pending for over seven years.

**C.      Executive Order 14164 and Attorney General Directions on Chapter 154 Certifications Invite a Renewed Certification Process**

34. On January 20, 2025, President Trump issued Executive Order 14164 to promote use of the death penalty. Section 4(b) of the Executive Order encourages the US Attorney General to decide pending applications for certification made by States under 28 U.S.C. § 2265. *See* Gutierrez Decl. Ex. 1.

35. Consistent with this Executive Order, on February 5, 2025, Defendant Attorney General Bondi issued a memo directing the OLP "to promptly address states' pending requests for certification pursuant to *id.* § 2265." *See* Memorandum *Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions*, *available at* https://www.justice.gov/ag/media/1388561/dl?inline (last visited Sept. 25, 2025). *See* Gutierrez Decl. Ex. 2.

36. On May 15, 2025, the OLP sent a letter to state attorneys general inviting their applications and offering assistance from DOJ. *See* Gutierrez Decl. Ex. 3.

**D.      Tennessee Seeks Chapter 154 Certification**

37. As noted above, an application by Tennessee under Chapter 154 was published on August 7, 2025, seeking certification by the Attorney General that Tennessee's assigned counsel mechanism satisfies Chapter 154's requirements as of October 23, 1995. Plaintiffs must engage in this pre-certification challenge to the Attorney General's process to preserve all their constitutional, administrative, and substantive challenges to the procedures for certification and the State's application—or risk forgoing their ability to seek judicial review of their claims by the Court of Appeals for the D.C. Circuit pursuant to 28 U.S.C. § 2265(c) and Chapter 158 of Title 28.

38. As result of their coerced participation in an administrative process that itself violates constitutional mandates, Petitioners have been placed under a heavy burden. As the requests for an extension of time by the individual Petitioners' counsel and the FDSETN explain, providing substantive public comments to enable Plaintiffs to challenge a certification determination requires substantial work. [8]

39. For example, when the DOJ issued its Notice of Request for Certification for Tennessee on August 7, 2025, it invited interested parties to submit comments on or before October 6, 2025. *See* Gutierrez Decl. Ex. 4 (Ferrel Letter); Gutierrez Decl. Ex. 5 (Henry Letter); Gutierrez Decl. Ex. 6 (Scalpone Letter Sept. 11, 2025). Tennessee sought retroactive certification for a 30-

---

[8] *See* Gutierrez Decl. Ex. 4, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Petition for extension of Time to Comment, Federal Defender Services of Eastern Tennessee, Sept. 3, 2025 ("Ferrell Letter") (counsel for Plaintiff Howard Hawk Willis); Gutierrez Decl. Ex 5, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of time, Federal Public Defender for the Middle District of Tennessee, Sept. 9, 2025 ("Henry Letter") (counsel for Plaintiff Andre Bland); Gutierrez Decl. Ex. 6, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of Time to Comment, Office of the Post-Conviction Defender for the State of Tennessee, Sept. 11, 2025 ("Scalpone Letter Sept. 11, 2025") (counsel for Plaintiff Urshawn Miller); Gutierrez Decl. Ex. 7, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of time, Office of the Post-Conviction Defender for the State of Tennessee, Sept. 19, 2025 ("Scalpone Letter Sept. 19, 2025"). The public comments are published at Regulations.gov under Docket ID no. DOJ-OLP-2025-0202, *available at* https://www.regulations.gov/docket/DOJ-OLP-2025-0202 (last visited Sept. 26, 2025).

year period stretching back to 1995. CHU-EDTN, TNM-CHU, and OPCD sought a 90-day extension to submit comments, explaining that responding to this request would require "research into decades of historic development" of the capital counsel mechanism, involving access to off-site storage units, gathering county court records, potential public records requests, and interviews of persons with knowledge of Tennessee's post-conviction proceedings. Gutierrez Dec. Ex. 4, p. 2. Tennessee's failure to provide any supporting documentation to DOJ with its application increased the burden on the commentors to ensure that DOJ considered all relevant information, as required by regulation:

> To provide the DOJ with this important, relevant information will require commentors to invest significant time and resources to identify relevant cases from these time periods, review their case files, interview relevant actors where possible, attempt to obtain fee vouchers for attorneys, attempt to obtain expert requests and expert vouchers, and synthesize that data into a coherent comment for DOJ's review.

Gutierrez Dec. Ex. 5, p. 2. TNM-CHU estimated that this process would require hundreds of hours of staff time. *Id.* Furthermore, the many unsupported statements and misrepresentations in Tennessee's application required commentors to compile extensive rebuttal information. Gutierrez Ex. 6, page 2.

40. The Attorney General denied the request for an extension on September 29, 2025, allowing only sixty days from the August 6 notice to the October 6 deadline for public comment. This short period increases the burden on the already burdened commenting agencies that had sought it. These agencies jointly represent a majority of those on Tennessee's death row. Gutierrez Dec. Ex. 4, page 1; Gutierrez Dec. Ex. 5, page 2; Gutierrez Dec. Ex. 6, page 1. The agencies' clients, during this foreshortened comment period, have continued to live under a cloud of uncertainty about the continued viability of their litigation, as the opt-in provisions threaten to upend the decades-old timelines of many of their cases. And the additional workload created for

19

their lawyers by the certification process has decreased the time available to litigate their ongoing cases. Gutierrez Dec. Ex. 4, page 3.

41. Accordingly, Plaintiffs are in an untenable position of being coerced into participating in a biased administrative process that grants the Attorney General the power to legislate, prosecute, and adjudicate the scope of federal habeas review of their death sentences. The unconstitutional proceeding is time-consuming, resource-intensive, and redirects limited resources away from their ability to defend against their sentences of death.

**E.    The Attorney General is the Nation's Chief Prosecutor**

42. The Attorney General is the nation's chief prosecutor whose institutional interests have consistently aligned with the interests of law enforcement and state prosecutors, and against those of capital defendants. Section 35 of the Judiciary Act of 1789 established the Office of the Attorney General. Ch. 20, 1 Stat. 73 ("And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned . . ."); *see Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985) ("As the Nation's chief law enforcement officer, the Attorney General provides vital assistance to the President in the performance of the latter's constitutional duty to 'preserve, protect, and defend the Constitution of the United States.' U.S. Const., Art. II, § 1, cl. 8."). In 1870, the current Department of Justice was established as an executive department of the federal government, led by the Attorney General as the chief law enforcement officer and legal advisor for the nation. An Act to Establish the Department of Justice, ch. 150, 16 Stat. 162, 162-165 (1870). Today, the Attorney General leads a department comprised of 40 separate component

organizations, including the Office of Legal Policy and the Capital Case Section within the Criminal Division, which oversees DOJ's capital prosecutions.[9]

43. As the nation's chief prosecutor, the Attorney General directs the Department of Justice regularly to oppose attempts to standardize or improve criminal defense performance. In this role, the Attorney General has been a forceful legal advocate for states and law enforcement in litigation challenging state convictions in federal habeas proceedings, has repeatedly asserted a legal interest in the standards for competent counsel and interpretations of procedural rules that restrict federal habeas review, and is a consistent and close partner with state and local law enforcement.

**F.    The Attorney General's Substantial Legal Interests in Federal Habeas Challenges to State Convictions Is Aligned with the Interests of States and Against Habeas Petitioners**

44. As the Attorney General has stated, the law governing the § 2255 petitions which the Attorney General opposes is substantively similar to and informed by law governing proceedings challenging state convictions in federal habeas corpus proceedings. *See* Brief for the United States as Amicus Curiae Supporting Petitioner (Warden), *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1 (arguing in state ineffective assistance of counsel case that "similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards."). The Attorney General has repeatedly asserted these institutional interests as an *amicus curiae* and advocate in the capital and habeas corpus context, including in cases involving constitutional challenges to the effectiveness of trial counsel.[10]

---

[9] *See* U.S. Dep't of Justice, Organizational Chart, https://www.justice.gov/agencies/chart/map (last visited Sept. 18, 2025).

[10] See, for example, Briefs of United States as *Amicus Curiae* in *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in Section 2254

proceedings . . . ."); *Day v. Crosby*, 2006 WL 139213 ("the Court's decision in this case will influence, if not control, the resolution of cases presenting similar questions under 28 U.S.C. § 2255. *See, e.g., United States v. Bendolph,* 409 F.3d 155 (3d Cir. 2005) (en banc). The United States therefore has a significant interest in this case.") (opinion at *Day v. McDonough*, 547 U.S. 198 (2006)); *Mayle v. Felix*, 2005 WL 435884 ("Because the Court's ruling will apply to collateral attacks on federal criminal judgments, the United States has a substantial interest in the outcome of this case.") (opinion at *Mayle v. Felix*, 545 U.S. 644 (2005)); *Rompilla v. Beard*, 2004 WL 2945403 ("Although this case involves a claim by a state prisoner under 28 U.S.C. § 2254, the Court's analysis will likely affect federal prisoners' ineffectiveness claims under 28 U.S.C. § 2255. The United States therefore has a substantial interest in the resolution of the question presented. The government has previously participated in numerous cases raising similar ineffective assistance of counsel questions.") (opinion at *Rompilla v. Beard*, 545 U.S. 374 (2005)); *Medellin v. Dretke*, 2005 WL 504490 ("The President, through subordinate Executive Branch officials, represents the United States in ICJ proceedings and in the United Nations (U.N.), and he has the lead role in determining whether, and if so, how, to comply with the determinations of such international bodies. The United States also has a substantial interest in the interpretation and effect given to international instruments to which it is a party.") (opinion at *Medellin v. Dretke*, 544 U.S. 660 (2005)); *Dretke v. Hayle*, 2003 WL 22970602 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the actual innocence exception applies in the same manner to collateral attacks by both federal and state prisoners. The United States has a substantial interest in the outcome of this case…") (opinion at *Dretke v. Haley*, 541 U.S. 386 (2004)); *Wiggins v. Smith*, 2003 WL 470211 ("The United States has a substantial interest in the resolution of the question on which the Court granted *certiorari*, because claims of ineffective assistance of counsel are frequently asserted on collateral review in federal criminal cases. Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision will likely affect ineffectiveness claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Wiggins v. Smith*, 539 U.S. 510 (2003)); *Bell v. Cone*, 2002 WL 122621 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision is also likely to affect ineffective-assistance-of-counsel claims brought by federal prisoners under 28 U.S.C. § 2255.") (opinion at *Bell v. Cone*, 535 U.S. 685 (2002)); *Mickens v. Taylor*, 2001 WL 1056945 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision likely will affect ineffective-assistance claims brought by federal prisoners under 28 U.S.C. § 2254 as well.") (opinion at *Mickens v. Taylor*, 535 U.S. 162 (2002)); *Roe v. Flores-Ortega*, 1999 WL 33611343 ("This case involves the proper standards for evaluating a claim that respondent's constitutional right to counsel was violated when his lawyer failed to perfect an appeal from the state court judgment entered on his plea of guilty. Because similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards, the United States has a substantial interest in the outcome of this case.") (opinion at *Roe v. Flores-Ortega*, 528 U.S. 470 (2000)); *Hopkins v. Reeves*, 1997 WL 720441 ("The Court's resolution of that question could affect the jury instructions given in federal capital proceedings.") (opinion at *Hopkins v. Reeves*, 524 U.S. 88 (1998)); *Strickland v. Washington*, http://www.usdoj.gov/osg/briefs/1983/sg830192.txt ("Claims of ineffective assistance of counsel are raised with increasing frequency in federal criminal cases, and the principles laid down in this case are likely to govern the disposition of such claims.") (opinion at *Strickland v. Washington,* 466 U.S. 668 (1984)); and *Engle v. Isaac*, 1981 WL 389902 ("The standard for determining when

Moreover, the Supreme Court has recognized the Attorney General's substantial interest in § 2254 cases by inviting the Solicitor General to submit *amicus curiae* briefs in cases involving the interpretation of § 2254. *See, e.g.*, *Slack v. McDaniel*, 1999 WL 1223771 ("The Court has invited the Solicitor General to express the views of the United States on the following questions.") (opinion at *Slack v. McDaniel*, 529 U.S. 473 (2000)); *Felker v. Turpin*, 1996 WL 284697 ("The United States has an important interest in the resolution of those issues. In the Court's order granting *certiorari* and specifying the questions to be briefed, the Court invited the Solicitor General to file a brief expressing the views of the United States.") (opinion at *Felker v. Turpin*, 518 U.S. 651 (1996)). Accordingly, the Attorney General has a substantial interest in the outcome and relevant legal standards in federal habeas corpus proceedings challenging state convictions, and has sided with the States' interpretations.

### a. The Attorney General's Amicus Advocacy Overwhelmingly Supports the States Because of Their Common Legal Interests

45. Since 2000, the Attorney General, through the Solicitor General's Office, has inserted itself into state prisoner habeas cases over twenty times.[11] It has done so overwhelmingly

---

an error that was not duly objected to at trial or raised on direct appeal can nevertheless support collateral relief is of substantial importance to the administration of justice in the federal system. The holding of the court of appeals in these cases-that the assumed futility of objection constitutes sufficient cause to excuse a failure to make timely objection-would, if sustained by this Court, substantially increase the susceptibility of otherwise final judgments in federal criminal cases to collateral attack.") (opinion at *Engle v. Isaac*, 456 U.S. 107 (1982)).

[11] *See Kahler v. Kansas*, 589 U.S. 271 (2020) (constitutional requirements of insanity test); *Kansas v. Carr*, 577 U.S. 108 (2016) (joint penalty phase trials); *Ryan v. Gonzales*, 568 U.S. 57 (2013); *Whorton v. Bockting*, 549 U.S. 406 (2007) (retroactivity of *Crawford v. Washington*); *Burton v. Stewart*, 549 U.S. 147 (2007) (non-retroactivity of *Blakely v. Washington*); *Day v. McDonough*, 547 U.S. 198 (2006) (timeliness of petition); *Hill v. McDonough*, 547 U.S. 573 (2006) (timeliness of petition); *Mayle v. Felix*, 545 U.S. 644 (2005) (timeliness of petition *Gonzalez v. Crosby*, 545 U.S. 524 (2005) (timeliness of petition); *Rompilla v. Beard*, 545 U.S. 374 (2005) (IAC); *Medellin v. Dretke*, 544 U.S. 660 (2005) (Vienna Convention); *Florida v. Nixon*, 543 U.S. 175 (2004) (IAC); *Dretke v. Haley*, 541 U.S. 386 (2004) (actual innocence in sentencing of non-capital petitioner);

on the side of the States, arguing against the challenges to state convictions and sentences and never in support of the petitioners. In cases in which the Attorney General moved to file a brief as *amicus curiae*, it stated an interest in the outcome because "similar collateral attacks on federal criminal judgements will generally be adjudicated under the same standards." *See*, *e.g.*, Brief for the United States as Amicus Curiae Supporting Petitioners (Director, Arizona Department of Corrections), *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in § 2254 proceedings . . . ."); Brief for the United Sates as Amicus Curiae Supporting Petitioner (Warden), *Roe v Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1.

46. Relatedly, in all the cases where the Attorney General has filed in support of a party, the Attorney General has advocated for the state and against the habeas petitioner. The Attorney General does not file in support of the petitioner; in a few cases, it has filed in support of neither party.[12] The Attorney General has argued for lower quality counsel for state defendants, and for tighter procedural restrictions on federal habeas to state prisoners. The Attorney General has never argued that a state petitioner received ineffective assistance of trial counsel. Not once has the Attorney General argued that a particular petitioner's case fits within the procedural guidelines of

---

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) (voluntariness of confession); *Schriro v. Summerlin*, 542 U.S. 348 (2004) (non-retroactivity of *Ring v. Arizona*); *Price v. Vincent*, 538 U.S. 364 (2003) (double jeopardy); *Wiggins v. Smith*, 539 U.S. 510 (2003) (IAC); *Bell v. Cone*, 535 U.S. 685 (2002) (IAC); *Mickens v. Taylor*, 535 U.S. 162 (2002) (trial attorney conflict of interest); *Tyler v. Cain*, 533 U.S. 656 (2001) (successive petitions); *Slack v. McDaniel*, 529 U.S. 473 (2000) (AEDPA's applicability to appeals of non-AEDPA petitions); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (IAC); and *Portuondo v. Agard*, 529 U.S. 61 (2000) (prosecutorial misconduct).

[12] *See Ramirez v Collier*, 596 U.S. 411 (2022)*; Shoop v. Twyford*, 596 U.S. 811 (2022)*; Nance v. Ward*; 597 U.S. 159 (2022).

§ 2254 and ought to be heard, instead persistently urging the Court to dismiss or deny petitions on procedural grounds.

47. Considering the number of times the Attorney General has chosen to express interests that are oppositional to the interest of state prisoners who are seeking habeas relief, the Attorney General cannot be regarded as a disinterested decision maker in habeas matters.

**b. The Attorney General Has Consistently Argued for Lower Standards of Effective Assistance of Defense Counsel**

48. The Attorney General has submitted a number of amicus briefs in the United States Supreme Court in cases specifically involving ineffective assistance of counsel arising from habeas corpus petitions challenging state convictions. *See, e.g., Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Bell v. Cone*, 535 U.S. 685 (2002); *Mickens v. Taylor*, 535 U.S. 162 (2002); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984). In every such case the Attorney General has opposed the petitioner's claim of ineffective assistance of counsel and urged a less rigorous standard of performance or denial of relief. *See* Briefs for the United States as Amicus Curiae*: Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 2004 WL 2945403; *Wiggins v. Smith*, 2003 WL 470211; *Bell v. Cone*, 2002 WL 122621; *Mickens v. Taylor*, 2001 WL 1056945; *Roe v. Flores-Ortega*, 1999 WL 33611343; and *Strickland v. Washington*, 466 U.S. 668 (1984).

49. Two cases in which the Supreme Court ruled that trial counsel were constitutionally ineffective illustrate that the Attorney General has argued forcefully for both the denial of habeas relief and for what the Court determined to be unconstitutionally low standards for defense representation. *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Respondent (Secretary, Pennsylvania Department of Corrections), *Rompilla v. Beard*, 545 U.S. 374 (2005) (No. 04-5462), 2004 WL 2945403, at *30 (arguing, unsuccessfully, that counsel was not deficient for

failing to obtain and review records regarding prior convictions that were used in aggravation during the penalty phase because such records "were simply not relevant"); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Wiggins v. Smith*, 539 U.S. 510 (2003) (No. 02-311), 2003 WL 470211, at *17 (arguing, unsuccessfully, that there was no applicable "standard for counsel's duty to investigate a capital defendant's background[, n]or should any such quasi-mandatory duty be created").

50. In both *Rompilla* and *Wiggins*, the Supreme Court rejected the Attorney General's position.

51. In *Rompilla*, the Court held that defense counsel's failure to examine the file in the defendant's prior conviction for rape and assault at the sentencing phase of capital murder trial fell below the level of reasonable performance, and that this failure was prejudicial to defendant, warranting habeas relief. The Attorney General asserted that defense counsel acted reasonably in concluding that further investigation into the defendant's background was unwarranted. The Attorney General incorrectly asserted that:

> [T]he professional norm, as recognized in *Wiggins* and the ABA standards the Court cited, is for counsel *to make efforts to discover* all reasonably available evidence by, first, conducting an interview with the defendant and then, based on that interview, acquiring all *relevant* records - which is precisely what counsel did in this case. Reading *Wiggins* more broadly, to impose an inflexible rule that counsel must always procure all reasonably available records, would render *Wiggins* inconsistent with this Court's decisions in *Strickland* and *Burger v. Kemp*, both of which recognized that courts may not impose rigid checklists on counsel but must evaluate an attorney's performance in view of the totality of circumstances, and both of which upheld investigations where counsel failed to seek the defendant's records after conducting interviews of the defendant and family members.

Brief for United States as Amicus Curiae, 2004 WL 2945403 at *11 (emphasis in the original, citations omitted). The Court rejected the Attorney General's view of what qualifies as

constitutionally adequate representation, specifically rejecting the position the government took at

oral argument with regard to duty to investigate the defendant's prior criminal record:

> At oral argument, the United States, arguing as an *amicus* in support of Pennsylvania, maintained that counsel had fulfilled their obligations to investigate the prior conviction by obtaining the rap sheet. Tr. of Oral Arg. 44-45. But this cannot be so. The rap sheet would reveal only the charges and dispositions, being no reasonable substitute for the prior conviction file.

*Rompilla*, 545 U.S. at 385, n.3.

52. The Attorney General also opposed relief in *Wiggins v. Smith*, 539 U.S. 510 (2003),

where the Court again found that defense counsel was ineffective. Mr. Wiggins's counsel failed to

investigate petitioner's life history beyond obtaining a presentence investigation report and

department of social services records, thus falling far short of prevailing professional standards.

The Attorney General, however, argued that defense counsel was not ineffective, citing in part the

psychologist retained by defense counsel. The Court specifically addressed this point:

> For its part, the United States emphasized counsel's retention of the psychologist. *Id*., at 51; Brief for United States as *Amicus Curiae* 27. But again, counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background. Though Stejskal based his conclusions on clinical interviews with Wiggins, as well as meetings with Wiggins' family members, Lodging of Petitioner, his final report discussed only petitioner's mental capacities and attributed nothing of what he learned to Wiggins' social history.

*Wiggins*, 539 U.S. at 532. In *Wiggins*, as in *Rompilla*, the Attorney General opposed the positions

of state capital defendants and sought to lower the bar for what constitutes competent defense

representation.

### c. The Attorney General Has Consistently Argued for Interpretation of Procedural Rules That Would Restrict Habeas Review

53. On several occasions in federal habeas cases challenging state convictions, the Attorney General has argued for interpretations of habeas law that impose greater procedural restrictions on federal habeas petitioners.

54. In *Day v. McDonough*, 547 U.S. 198 (2006), the Supreme Court decided that federal district courts are permitted, although not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition, but only if the court accords the parties fair notice and an opportunity to present their positions. *Day*, 547 U.S. at 209. The Attorney General moved to file a brief as *amicus curiae*, inserting itself into the case to argue that the rules of habeas procedure do not divest district courts of an "independent authority to abide by the limitations on habeas review." Brief for United States as *Amicus Curiae*, 2006 WL 139213, *6. The Attorney General encouraged the Court to place a higher value on the "disposition" of petitions than on the essence of a petitioner's claim, arguing that "the State's act of filing a response in this case, even one that erroneously conceded that the petition was timely, did not deprive the district court of its authority to enforce the limitations period that Congress has adopted to promote the prompt filing and disposition of habeas corpus petitions." Brief for United States as *Amicus Curiae*, 2006 WL 139213, *6.

55. In *Mayle v. Felix*, 545 U.S. 644 (2005), the Court held that petitioner's amended petition, filed after the one-year federal habeas limitations period and targeting his statements in a pretrial interrogation, did not (as the petitioner maintained) relate back to the date of the original petition, which challenged the admission of a prosecution witness's videotaped testimony. The Attorney General filed an *amicus* brief arguing that a state prisoner "cannot rely on the doctrine of relation back, under Federal Rule of Civil Procedure 15(c)(2), to render timely under the AEDPA's limitation period an otherwise untimely amendment to an original habeas petition, when the

28

amendment articulates new grounds for relief and supporting facts that differ from those alleged in the original petition." Brief for United States as *Amicus Curiae*, 2006 WL 435884, *7. The Attorney General here again argued for limiting review of a state prisoner's federal habeas petition.

56. In *Dretke v. Haley*, 541 U.S. 386 (2004), the Attorney General entered as *amicus curiae* to oppose an exception to a procedural bar based on actual innocence. The Attorney General encouraged the Court to hold that an actually innocent non-capital offender should not be granted the "actual innocence" exception to procedural default of a constitutional claim of sentencing error. The Court declined to make such a holding. *Id*. at 393-94 ("We decline to answer the question in the posture of this case and instead hold that a federal court faced with allegations of actual innocence, whether of the sentence or of the crime charged, must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default.").

57. The Court noted that both Mr. Dretke and the State of Texas conceded that petitioner had a viable and significant ineffective assistance of counsel claim. The Court decided to remand the case to the District Court to consider non-defaulted, alternative grounds for relief, in spite of the Attorney General having urged the court to consider judicial economy over actual innocence. *Id*.; Brief of the United States as *Amicus Curiae*, 2003 WL 22970602, *16-19.

58. In *Engle v. Isaac*, 456 U.S. 107 (1982), the Attorney General, as *amicus curiae*, urged the Court to deny federal habeas corpus review and relief on a substantively valid claim that involved a procedural default. The Attorney General argued that unless there was a finding of constitutionally ineffective assistance of trial counsel, "there is certainly no justification for refusing to permit the state to enforce its procedural default rule." Brief for the United States as Amicus Curiae, 1981 WL 389902, *21. The case repeats the consistent pattern of the Attorney General's efforts to limit habeas review.

59. As the Attorney General's advocacy as an *amicus* in federal habeas cases challenging state convictions demonstrates, the Attorney General has—perhaps understandably—been an interested advocate: the chief prosecutor, not an impartial decision maker. Moreover, the Attorney General has exclusively advocated in support of the state and in opposition to the petitioner, or on behalf of no party. Not only is the Attorney General a consistent advocate for one side, but unlike agencies delegated administrative power, there is also no adjudicatory aspect to the office's activities. The Attorney General, in the context of federal habeas review, is an advocate and only an advocate, and that advocacy is entirely for one side. When required to make a decision, as under the Reauthorization Act amendment, in the very same context in which the office has so consistently played the role of an advocate, it is impossible to imagine that the Attorney General will not continue to favor the side that the office has always favored in the past and, at a minimum, the great risk of the appearance of bias. Moreover, the impact of the Attorney General's unconstitutional bias is compounded by the broad delegation of discretion to define the standards under which the office will assess a state's application.

### d. The Attorney General Is a Consistent Partner with State Law Enforcement and Cannot Neutrally Judge a State's Compliance with Chapter 154

60. In addition to asserting aligned legal positions in litigation, the Attorney General also works in partnership with state prosecutors to further their common litigation interests, consistent with the office's responsibilities as the chief law enforcement officer for the nation. *See Mitchell*, 472 U.S. at 520. For example, under the leadership of the Attorney General, Department of Justice officials are members of the Association of Government Attorneys in Capital Litigation ("AGACL"), an association of state and federal prosecutors. *See History*, Association of Government Attorneys in Capital Litigation, http://agacl.com/history/ (last visited Aug. 12, 2025). In addition to an annual conference and other training projects, the AGACL is involved in

developing a brief bank, in conjunction with the National District Attorneys Association, National Association of Prosecutor Coordinators, and the National Association of Attorneys General, to be shared among state and federal prosecutors.

61. The partnership with state and local law enforcement, in training,[13] funding,[14] and actual prosecutorial functions is far too close to allow the Attorney General to escape the reality of the office's bias in favor of state prosecutions. Given the consistency of the Attorney General's cooperation with and assistance of state and local law enforcement, and the lack of any similar role with regard to defense counsel, it is again clear that the Attorney General's position is that of a partisan advocate, not a neutral decision maker.

62. Finally, as detailed above, the President has charged the Attorney General with encouraging states to seek capital charges, ensuring that states have drugs to perform executions, and attempting to overrule Supreme Court precedents that limit the government's authority to impose the death penalty. The Attorney General has also commanded "the relevant U.S. Attorney's

---

[13] For example, the Bureau of Justice Assistance ("BJA"), a division in the Office of Justice Programs under the supervision of the Attorney General, long has provided local and state law enforcement training on a wide variety of topics. *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, National Training and Technical Assistance Center, at https://bjatta.bja.ojp.gov/about (last visited Sept. 25, 2025). The Department of Justice formalized this association by joining with the National District Attorneys Association to create the National Advocacy Center, located on the University of South Carolina campus in Columbia, South Carolina, where training facilities for American prosecutors at all levels—federal, state and local— are concentrated in one facility. *See* https://www.ndaa-apri.org/education/nac_index.html (last visited Sept. 25, 2025). Indeed, the Department of Justice transferred its central training facility for federal prosecutors from Washington, D.C. to the National Advocacy Center.

[14] *See, e.g.*, Grants at https://www.justice.gov/grants (last visited Sept. 25, 2025).

Offices . . . to assist local prosecutors in pursuing death sentences under state law against the 37 commuted inmates" to whom President Biden granted clemency.[15]

63. While allowing the Attorney General to make the certification determination under Chapter 154 may not constitute being "a judge in his own case," *In re Murchison*, 349 U.S. 133, 136 (1955), it essentially equates with allowing the office to act as judge in its brother's case and thus violates the principle that "no man is permitted to try cases where he has an interest in the outcome." *Id.*

## CLAIMS FOR RELIEF

### COUNT 1
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Fifth Amendment of the U.S. Constitution – Procedural Due Process (biased process)**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

64. Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

65. The Attorney General's decision-making authority to decide certification applications under § 2265, on its face, violates the Due Process Clause of the Fifth Amendment and is unconstitutional. Specifically, the Attorney General is a biased decision maker that cannot fairly decide Tennessee's application for certification under Chapter 154 in disinterested and neutral manner.

66. For these reasons, § 2265 violates the Fifth Amendment to the U.S. Constitution.

---

[15] *See* Gutierrez Decl. Ex. 2; Attorney General, Restoring a Measure of Justice to the Families of Victims of Commuted Murderers, Feb. 5, 2025, https://www.justice.gov/ag/media/1388526/dl?inline (last visited Sept. 24, 2025).

**COUNT 2**
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Article III, § 1 of the U.S. Constitution – Separation of Powers (encroachment of judicial authority)**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

67.  Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

68. The transfer of decision-making authority under § 2265 from the federal habeas court to the Attorney General impermissibly encroaches upon core judicial functions under Article III to decide habeas corpus petitions.

69. For these reasons, § 2265 violates Article III to the U.S. Constitution.

**COUNT 3**
**Challenge to the constitutionality of 28 U.S.C. § 2265 (authority of Attorney General to make certification determinations)**
**Article III of, and the Fifth Amendment to, the U.S. Constitution – Separation of Powers and Due Process in Combination**
**All Plaintiffs**
**Against All Defendants in Their Official Capacity**

70. Plaintiffs restate and incorporate by reference each and every allegation of the preceding paragraphs.

71. The transfer of authority to an unconstitutionally biased decision maker and the encroachment upon the judicial authority of the federal counts under Article III concerning habeas review, considered together, create an aggrandizement of constitutional power in the Attorney General under § 2265 that flouts the protections and structure of the Constitution.

72. For these reasons, the certification process under § 2265 violates Article III, § 1 of the U.S. Constitution and the procedural due process clause of the Fifth Amendment to the U.S. Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

(A)    Declare that 28 U.S.C. § 2265 violates Article III and the Due Process Clause of

Fifth Amendment of the Constitution;

(B)    Preliminarily enjoin the Defendants from conducting an unconstitutional

certification proceeding pending final resolution of this action; and

(C)    Grant any other and further relief this Court deems just, proper, and appropriate.

Respectfully submitted,

Dated: September 30, 2025

/s/ _____

Gitanjali S. Gutierrez, N.Y. 4183935*          Maria V. Morris, D.C. 1697904
Claudia Van Wyk, N.Y. - 1706514 *             **ACLU FOUNDATION**
**ACLU FOUNDATION**                            915 15th Street, N.W.
201 W. Main St., Ste. 402                      Washington, D.C. 20005
Durham, N.C. 27701                             Tel: 202-393-4930
Tel: 919-682-5659                              mmorris@aclu.org
ggutierrez@aclu.org
cvanwyk@aclu.org

\* *Pro hac vice application forthcoming.*

*Attorneys for Plaintiffs*