# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ANDRE BLAND, URSHAWN MILLER, HOWARD HAWK WILLIS, FEDERAL DEFENDER SERVICES OF EASTERN TENNESSEE, and FEDERAL PUBLIC DEFENDER FOR THE MIDDLE DISTRICT OF TENNESSEE,<br><br>*Plaintiffs*,<br><br>v.<br><br>PAMELA J. BONDI, in her official government capacity, and the UNITED STATES DEPARTMENT OF JUSTICE.<br><br>*Defendants*. | Case No: __1:25-cv-3499__ |

**PLAINTIFF'S STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THEIR MOTION FOR TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTUAL AND LEGAL BACKGROUND ...................................................................... 4

   I.    Chapter 154 limits important rights otherwise
       guaranteed to federal habeas petitioners. ........................................................... 5

   II.   The Reauthorization Act transferred certification
       authority from federal courts to the Attorney General. ................................... 6

   III.  Tennessee seeks Chapter 154 certification................................................... 10

   IV.  The Attorney General is the nation's chief prosecutor
       whose interests are aligned with States. ......................................................... 12

ARGUMENT ...................................................................................................................... 13

   I.    This Court has jurisdiction to hear the Plaintiffs' constitutional claims. ..................... 13

   II.   Plaintiffs are likely to prevail on the merits of their
       Fifth Amendment Due Process Claim. .......................................................... 16

      A.  The Attorney General is an unconstitutionally biased
          decisionmaker concerning the Chapter 154 certification for Tennessee ............... 16

      B.  The Attorney General's substantial legal interests in
          federal habeas challenges to state convictions is aligned
          with the interests of states and against habeas petitioners. ................................. 20

      C.  The Attorney General is a consistent partner with
          state law enforcement and cannot neutrally judge
          a state's compliance with Chapter 154................................................... 28

      D.  The Attorney General's dual role as prosecutor and
          adjudicator creates a high probability of actual bias. ............................. 29

   III.  Plaintiffs are likely to prevail on the merits of their
       Article III separation of powers claim.......................................................... 31

      A.  The judicial power to decide federal habeas cases belongs
          exclusively to an independent federal judiciary. ........................................ 32

      B.  Section 2265 transfers judicial decision making from
          federal courts to the Attorney General in violation of Article III........................ 36

C.  The provision for *de novo* Court of Appeals review
offers no cure for Chapter 154's constitutional infirmities....................................40

IV.  Plaintiffs are likely to prevail on the merits of their claim
that § 2265 violates the Due Process Clause and the
separation of power doctrine under Article III when these
constitutional provisions are considered together. ....................................... 42

V.  Plaintiffs have suffered and will continue to suffer irreparable harm. ......................... 43

VI.  The balance of equities and public interest favor granting a temporary restraining
order................................................................................................................................. 44

CONCLUSION ................................................................................................................ 45

# TABLE OF AUTHORITIES

**CASES**                                                              **Page(s)**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014).......................................................... 22

*Abdulrahman v. Ashcroft*, 330 F.3d 587 (3d Cir. 2003) ................................................ 27

*Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley*,
    114 F.3d 840 (9th Cir. 1997) .................................................................... 26, 31

*Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN),

2025 WL 435415 (D.D.C. Feb. 7, 2025) ......................................................................... 22

*Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016).................................................................. 26

*Ashmus v. Woodford*, 202 F.3d 1160 (9th Cir. 2000) ...................................................... 7

*Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) ................................................................... 7

*Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023) ................................................... 3, 23, 43

*Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000)............................................................ 7

*Bell v. Cone*, 535 U.S. 685 (2002) ........................................................................... 15, 17

*Bell v. Haley*, 437 F. Supp. 2d 1278 (M.D. Ala. 2005) ................................................... 7

*Bell v. Hood*, 327 U.S. 678 (1946)................................................................................. 23

*Boumediene v. Bush*, 553 U.S. 723 (2008) .................................................................... 40

*Brown v. Lambert*, No. C01-715C (W.D. Wash. Sept. 6, 2001) ...................................... 7

*Brown v. Puckett*, 2003 WL 21018627 (N.D. Miss. 2003)............................................... 7

*Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996) .................................................................. 7

*Burton v. Stewart*, 549 U.S. 147 (2007).......................................................................... 15

*Caperton v. Massey*, 556 U.S. 868 (2009) ...................................................................... 26

*Carter v. Friel*, No. 2:02CV326TS,
    2005 WL 1683689 (D. Utah July 18, 2005) ........................................................ 7

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ........................................................ 35

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) ........................................ 33

*Corfield v. Coryell*, 6 F. Cas. 546 (C.C.E.D. Pa. 1823) ........................................ 34

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61 (2001) ........................................ 23

*Crowell v. Benson*, 285 U.S. 22 (1932) ........................................................ 32

*Day v. McDonough*, 547 U.S. 198 (2006) ........................................ 15, 18, 41

*Death Row Prisoners of Pa. v. Ridge*, 106 F.3d 35 (3rd Cir. 1997) ........................................ 7

*Doe v. McHenry*, No. 1:25-cv-286-RCL,
    2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025) ........................................ 22

*Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395 (4th Cir. 1995) ........................................ 28

*Dretke v. Haley*, 541 U.S. 386 (2004) ........................................ 15

*Employment Div., Dept. of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) ........................................................ 42

*Engle v. Isaac*, 456 U.S. 107 (1982) ........................................ 19

*Ex parte Bollman*, 8 U.S. (4 Cranch) 75 (1807) ........................................ 34, 35

*Ex parte Royall*, 117 U.S. 241 (1886) ........................................ 35

*Ex parte Yerger*, 75 U.S. 85 (1868) ........................................ 35

*Florida v. Nixon*, 543 U.S. 175 (2004) ........................................ 15

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........................................ 28, 30

*Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010) ........................................ 23, 24, 25

*Gonzalez v. Crosby*, 545 U.S. 524 (2005) ........................................ 15

*Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995) ........................................ 27

*Habeas Corpus Resource Ctr. v. Dep't of Justice*,
    2009 WL 185423 (N.D. Cal. Jan. 20, 2009) ................................................................ 30

*Harrison v. McBride*, 428 F.3d. 652 (7th Cir. 2005) ................................................................ 27

*Hill v. Butterworth*, 941 F. Supp. 1129 (N.D. Fla. 1996) ........................................................ 7

*Hill v. McDonough*, 547 U.S. 573 (2006) ................................................................................ 15

*Holland v. Florida*, 560 U.S. 631 (2010) ................................................................................. 41

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001) ...................................................................................... 40

*In re Murchison*, 349 U.S. 133 (1955) ............................................................................... 22, 26

*In re Oliver*, 333 U.S. 257 (1948) ............................................................................................ 27

*John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194 (D.D.C. 2017) .................. 43

*Kahler v. Kansas*, 589 U.S. 271 (2020) ................................................................................... 15

*Kansas v. Carr*, 577 U.S. 108 (2016) ...................................................................................... 15

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020) ..................................................................... 22

*Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000) ................................................................. 7

*Langford v. Day*, 110 F.3d 1380 (9th Cir. 1997) ...................................................................... 7

*Leavitt v. Arave*, 927 F. Supp. 394 (D. Idaho 1996) ................................................................. 7

*Lindh v. Murphy*, 521 U.S. 320 (1997) ..................................................................................... 6

*Lindh v. Murphy*, 96 F.3d 856 (7th Cir. 1996) ....................................................................... 35

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ....................................................................... 26

*Martinez High v. Turpin*, 14 F. Supp. 2d 1358 (S.D. Ga. 1998) ................................................ 7

*Mayle v. Felix*, 545 U.S. 644 (2005) ................................................................................... 15, 19

*McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation*,
    606 U.S. 146 (2025) .......................................................................................................... 41

*Medellin v. Dretke*, 544 U.S. 660 (2005) ............................................................................ 13, 15

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ................................................................. 44

*Mickens v. Taylor*, 535 U.S. 162 (2002) ................................................................ 15, 17

*Mills v. Anderson*, 961 F. Supp. 198 (S.D. Ohio 1997) ............................................... 7

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ............................................................ 12, 21

*Nance v. Ward* 597 U.S. 159 (2022) ......................................................................... 16

*Noel v. Norris*, 194 F. Supp. 2d 893 (E.D. Ark. 2002) ................................................. 7

*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ............ 32, 34, 39

*Palmer v. Clarke*, 293 F. Supp. 2d 1011 (D. Neb. 2003) .............................................. 7

*Perales v. Richardson*, 402 U.S. 389 (1971) ............................................................. 27

*Peretz v. United States*, 501 U.S. 923 (1991) ............................................................ 37

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) ......................................................... 7

*Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir. 1998) .............................................. 7

*Portuondo v. Agard*, 529 U.S. 61 (2000) .................................................................. 15

*Powell v. Ward*, 542 F.2d 101 (2d Cir. 1976) ............................................................ 26

*Price v. Vincent*, 538 U.S. 364 (2003) ...................................................................... 15

*Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ............................... 44

*Ramirez v Collier*, 596 U.S. 411 (2022) ................................................................... 16

*Rasul v. Bush*, 542 U.S. 466 (2004) ......................................................................... 33

*Roe v. Flores-Ortega*, 528 U.S. 470 (2000) .......................................................... 15, 17

*Rompilla v. Beard*, 545 U.S. 374 (2005) .......................................................... 15, 17, 18

*Ryan v. Gonzales*, 568 U.S. 57 (2013) ............................................................... 15, 17

*Schriro v. Summerlin*, 542 U.S. 348 (2004) ............................................................... 15

*Schweiker v. McClure*, 456 U.S. 188 (1982) ......................................................... 26, 27

*Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997) ............................................... 7

*Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109 (2024) ............................................... 39

*Sexton v. French*, 163 F.3d 874 (4th Cir. 1998) ....................................................... 7

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ................................................... 22

*Shoop v. Twyford*, 596 U.S. 811 (2022) ..................................................................... 16

*Simms v. District of Columbia*, 872 F. Supp. 2d 90 (D.D.C. 2012) ...................... 4, 44

*Slack v. McDaniel*, 529 U.S. 473 (2000) .................................................................... 15

*Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002) ......................................................... 7

*Stern v. Marshall*, 564 U.S. 462 (2011) ..................................................................... 32

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................ 17

*Texaco, Inc. v. FTC*, 336 F.2d 754 (D.C. Cir. 1964) .................................................. 28

*The Slaughter-House Cases*, 83 U.S. (16 Wall.) 394 (1873) ..................................... 34

*Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568 (1985) ................................ 33

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ....................................... 23, 25

*Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998) ................................................ 7

*Trans World Airlines, Inc. v. Civil Aeronautics Bd.*,
    254 F.2d 90 (D.C. Cir. 1958) ............................................................................ 28

*Tucker v. Catoe*, 221 F.3d 600 (4th Cir.) ..................................................................... 7

*Tumey v. Ohio*, 273 U.S. 510 (1927) ..................................................................... 26, 27

*Tyler v. Cain*, 533 U.S. 656 (2001) ............................................................................ 15

*United States v. Johnston*, 258 F.3d 361 (5th Cir. 2001) ............................................ 35

*United States v. Raddatz*, 447 U.S. 667 (1980) .......................................................... 37

*United States v. Will*, 449 U.S. 200 (1980) ................................................................ 39

*Verizon Communications Inc. v. Federal Communications Commission*,
    ___ F.4th ___, 2025 WL 2609127 (Sept. 10, 2025) ......................................... 41

*Walker v. City of Berkeley*, 951 F.2d 182 (9th Cir. 1991) .......................................... 27

*Ward v. Village of Monroeville, Ohio*, 409 U.S. 57 (1972) ........................................ 27

*Whorton v. Bockting*, 549 U.S. 406 (2007) ................................................................. 15

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................ 15, 17, 18

*Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996) .......................................... 7

*Williams v. Pennsylvania*, 579 U.S. 1 (2016) ................................................... 26, 28

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) .......................................... 7

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................... 2, 22

*Withrow v. Larkin*, 421 U.S. 35 (1975) ............................................................... 27

*Wright v Angelone*, 944 F. Supp. 460 (E.D. Va. 1996) ...................................... 7

## U.S. CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V .......................................................................................... 26

U.S. Const. art. I ................................................................................................. 34

U.S. Const. art. III .............................................................................................. 32

## STATUTES

18 U.S.C.§ 1951 ..................................................................................................... 9

28 U.S.C. § 1331 ........................................................................................ 22, 23, 25

28 U.S.C. § 2255 .................................................................................................. 13

28 U.S.C. § 2261 ................................................................................................. 1,8

28 U.S.C. § 2263 ................................................................................................... 5

28 U.S.C. § 2265 ........................................................................................... passim

28 U.S.C. § 2266 ................................................................................................... 5

28 U.S.C. § 2347 ................................................................................................. 24

Judiciary Act of 1789, § 35, ch. 20, 1 Stat. 73 ................................................. 12

Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996) .................................................. 6

Pub. L. No. 109-177, § 507(c)(1), 120 Stat. 192 (2006)............................................... 8

**REGULATIONS**

28 C.F.R. § 26.23 ....................................................................................................... 4

**OTHER AUTHORITIES**

151 Cong. Rec. E2639-40, E2639 (Dec. 22, 2005)
    (statement of Rep. Flake), 2025 WL 3501657........................................... 8, 38

152 Cong. Rec. S1598, 1620-28 (Mar. 2, 2006) (statement of Sen. Kyl) ............... 8, 39

78 Fed. Reg. 58160 (Sept. 23, 2013) ............................................ 24, 25, 36

Brian M. Lipshutz, *Bypassing Agency Adjudication*,
    103 Wash. U.L. __ (2026) (forthcoming) ........................................ 23

Brief of United States as Amicus Curiae
    Supporting Petitioner (Warden), *Roe v. Flores-Ortega*,
    528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343......................... 13, 16

Brief of United States as Amicus Curiae in
    *Felker v. Turpin*, 1996 WL 284697 .................................................. 15

Brief of United States as Amicus Curiae in
    *Mickens v. Taylor*, 2001 WL 1056945................................................ 14, 17

Brief of United States as Amicus Curiae in
    *Bell v. Cone*, 2002 WL 122621.......................................................... 14, 17

Brief of United States as Amicus Curiae in
    *Day v. Crosby*, 2006 WL 139213 ...................................................... 13

Brief of United States as Amicus Curiae in
    *Dretke v. Hayle*, 2003 WL 22970602 ................................................ 14

Brief of United States as Amicus Curiae in
    *Engle v. Isaac*, 1981 WL 389902....................................................... 14

Brief of United States as Amicus Curiae in
    *Hopkins v. Reeves*, 1997 WL 720441 ................................................ 14

Brief of United States as Amicus Curiae in
    *Mayle v. Felix*, 2005 WL 435884 ...................................................... 13

Brief of United States as Amicus Curiae in
    *Medellin v. Dretke*, 2005 WL 504490 .............................................................. 14

Brief of United States as Amicus Curiae in
    *Roe v. Flores-Ortega*, 1999 WL 33611343 ................................................. 14, 17

Brief of United States as Amicus Curiae in
    *Rompilla v. Beard*, 2004 WL 2945403 ....................................................... 13, 17

Brief of United States as Amicus Curiae in
    *Ryan v. Gonzales*, 568 U.S. 57 (2013) .................................................. 13, 16, 17

Brief of United States as Amicus Curiae in
    *Slack v. McDaniel*, 1999 WL 1223771 .............................................................. 15

Brief of United States as Amicus Curiae in
    *United States v. Bendolph,* 409 F.3d 155 (3d Cir. 2005) ................................... 13

Brief of United States as Amicus Curiae in
    *Wiggins v. Smith*, 2003 WL 470211 ...................................................... 14, 17, 18

Comment on OLP180 Tennessee Capital Counsel Mechanism
    90 FR 38182 – Petition for extension of Time to Comment,
    Federal Defender Services of Eastern Tennessee, Sept. 3, 2025 ......................... 10, 11, 12

Comment on OLP180 Tennessee Capital Counsel Mechanism
    90 FR 38182 – Request for extension of time,
    Federal Public Defender for the Middle District of Tennessee, Sept. 9, 2025 ........... 10, 11

Comment on OLP180 Tennessee Capital Counsel Mechanism
    90 FR 38182 – Request for extension of Time to Comment,
    Office of the Post-Conviction Defender for the State of Tennessee, Sept. 11, 2025.. 10, 11

Comment on OLP180 Tennessee Capital Counsel Mechanism
    90 FR 38182 – Request for extension of time,
    Office of the Post-Conviction Defender for the State of Tennessee, Sept. 19, 2025 ....... 10

DOJ Docket ID DOJ-OLP-2017-0009 ................................................................... 9

DOJ Docket ID DOJ-OLP-2017-0010 ................................................................. 10

H.R. Rep. No. 104-23 (1995) ............................................................................. 5

James S. Liebman & William F. Ryan, *"Some Effectual Power":*
*The Quantity and Quality of Decisionmaking Required of*
*Article III Courts*, 98 Colum. L. Rev. 696 (1998) ............................................................ 32

John M. Golden & Thomas H. Lee, *Article III, the Bill of Rights,*
*and Administrative Adjudication*, 92 Fordham L. Rev. 397 (2023) ................................. 40

Memorandum from Jeff Sessions, Att'y Gen., U.S. Dep't of Justice,
to the Acting Ass't. Att'y Gen., Office of Legal Policy (Aug. 22, 2017) ......................... 30

The Attorney Gen.'s Auth. in Certifying Whether A State Has
Satisfied the Requirements for Appointment of Competent Counsel
for Purposes of Capital Conviction Review Proceedings,
2009 WL 7513855 (O.L.C. Dec. 16, 2009) ..................................................................... 36

## INTRODUCTION

When an individual faces the possibility of a future execution, the Constitution's protections mean the most. They guarantee, at the very least, that Plaintiffs will appear before a neutral and disinterested federal court. Yet, with Tennessee's application to invoke the "opt-in" provisions of Chapter 154 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified at 28 U.S.C. § 2261, *et seq.*, Petitioners find themselves facing an absurdity: the nation's highest *prosecutor* determines whether their state postconviction *defense* was sufficiently adequate for brethren state prosecutors to assert a truncated and fast-tracked federal habeas review. Compounding the constitutional farce, Chapter 154 removes core judicial decisions about Plaintiffs' rights to federal habeas review from the control of the federal district to place them instead in the waiting hands of the Attorney General. Together, these features of § 2265 of Chapter 154 enact a procedural charade that fails to disguise its encroachment on the federal district courts' judicial authority to hear habeas petitions, the pro-prosecution bias of the Attorney General, or the unconstitutional aggrandizement of the Attorney General's power.

Remarkably, in the nearly twenty years that this possibility has been looming under Chapter 154 no federal court has considered whether this arrangement proves constitutionally sound. It does not. Until a federal court addresses this question, Plaintiffs face the ongoing burden of attempting to demonstrate to the nation's chief prosecutor the inadequacy of Tennessee's state postconviction counsel mechanism. It is an exercise in futility that defies constitutional common sense, extracts an ongoing heavy cost, and may endure for years without resolution.

Today, Plaintiffs seek a temporary restraining order to stop this administrative absurdity and restore the neutrality of habeas review in federal district courts. They seek to prevent the further ongoing and irreparable harm they are suffering by being required to vindicate their constitutional rights in an unconstitutional administrative proceeding before an unconstitutional

1

decision maker. Plaintiffs can establish that they will "likely . . . . succeed on the merits, that [they] are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

*First*, Plaintiffs have a likelihood of success on all three of their claims. The Due Process Clause of the Fifth Amendment is violated by the Attorney General's authority under § 2265 to determine certification applications. The Attorney General cannot act with sufficient independence and neutrality to fulfill the constitutional guarantee of structural due process. The Attorney General's institutional interests in the outcome of the certification determination arise from the office's legal advocacy and interests that are biased in favor of the state and its close partnership with States and state law enforcement. These factors ensure that the Attorney General cannot be the disinterested and neutral decision maker the Due Process Clause requires.

Section 2265 also violates the Constitution's separation of powers doctrine by transferring Article III judicial power to the Attorney General. Section 2265 grants to the Attorney General the authority to make certification decisions in the first instance—detached from any individual habeas petition—and seeks to make that decision binding on the federal district court in an individual petitioner's habeas review. Article III requires federal courts to make all habeas-related determinations in the first instance. Further, the provision in § 2265(c) for *de novo* review in the Court of Appeals for the District of Columbia Circuit is inadequate to avoid judicial encroachment. The judicial review under § 2265 purports to be limited to the Attorney General's certification decision. The Court of Appeals also makes an aggregate determination about a state mechanism divorced from the facts of any one case and it raises significant due process concerns for that Court's decision to bind a future habeas petitioner. Further, that Court's aggregate decision cannot

preclude the federal district court's equitable determination that each petitioner should receive, for example, a period for equitable tolling.

Finally, while each constitutional violation, standing alone, requires this court to declare § 2265 unconstitutional, considered together, the constitutional infirmities aggrandize the Attorney General's power in a manner that flouts the protections and structure of the Constitution.

*Second*, Plaintiffs are suffering irreparable harm by being forced to vindicate their constitutional rights in an unconstitutional proceeding before an unconstitutional decision maker. Being forced to appear before such an illegitimate agency decision maker causes a "here-and-now" injury. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191 (2023). But unlike other harms that can be corrected by federal courts after an illegitimate proceeding ends, this harm "has already happened [and] cannot be undone" and "[j]udicial review . . . would come too late to be meaningful." *Axon*, 598 U.S. at 191. This is why Plaintiffs need a temporary restraining order *before* having to continue with the Attorney General's certification process, which will in turn determine the procedures applicable to their federal habeas review. As experience has shown with the efforts by Arizona and Texas to seek certification, *see* Complaint ¶¶ 31-33, and the measures taken by the federal capital and state postconviction defenders in those states to demonstrate the deficiencies in such applications, Plaintiffs may face years of administrative proceedings and litigation to pursue their right to constitutional federal habeas review procedures by contesting Tennessee's assertion that it is entitled to apply the fast track procedures under Chapter 154 for federal habeas review. Plaintiffs would not and perhaps for years endure this burden, even if the Circuit Court were to determine, years later, that the framework of § 2265 violates the Constitution.

*Finally*, the balance of equities and public policy favor enjoining the Attorney General's certification determination. As to the equities, the Attorney General will suffer little to no inequity

from a pause in the administrative determination and the continued availability only of proceedings under § 2254. Allowing an unconstitutional government process to continue serves no public interest. Rather, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (internal quotation marks omitted).

Plaintiffs request that this Court preliminarily enjoin the Attorney General from deciding Tennessee's certification application until the constitutional infirmities in the decision-making structure under § 2265 have been resolved. Plaintiffs seek to ensure that their rights are respected through a constitutionally valid proceeding. Plaintiffs face immediate and ongoing harm in being subjected to an unconstitutional proceeding before an unconstitutional decision maker determining whether Tennessee is entitled to apply expedited federal habeas review procedures against the Plaintiffs. The only way to ensure that this determination comports with the Constitution is to pause the certification proceedings under § 2265 until the Plaintiffs are able to secure a declaration whether the Attorney General's authority to make such a determination is unconstitutional.

## FACTUAL AND LEGAL BACKGROUND

On August 7, 2025, the Office of Legal Policy (OLP) published an application from Tennessee seeking the Attorney General's certification under Chapter 154 of its mechanism for providing post-conviction assigned counsel, effective as of October 23, 1995. The deadline for public comments on the application is October 6, 2025. There is no deadline for the Attorney General's certification decision, and the Attorney General may publish "subsequent notice[s]" for further opportunity to comment before deciding the application. 28 C.F.R. § 26.23(c).

4

I.       **Chapter 154 limits important rights otherwise guaranteed to federal habeas petitioners.**

Congress enacted Chapter 154 as part of AEDPA to provide a "quid pro quo arrangement under which states are accorded stronger finality rules on federal habeas review in return for strengthening the right to counsel for indigent capital defendants." H.R. Rep. No. 104-23, at 10 (1995). To be certified as an "opt-in" State, a State must meet the requirements of Chapter 154 to provide individuals sentenced to death with competent, adequately compensated, and properly resourced state postconviction counsel. Once certified, a State is entitled to assert Chapter 154's restricted procedures for federal habeas review. These include a shorter of statute of limitations of 180 days instead of 1 year, 28 U.S.C. § 2263(a); more limited grounds for tolling of the statute of limitations, § 2263(b); restrictions on the ability to file an amended habeas petition, § 2266(b)(3)(B); requiring a federal district court to enter final judgment on a habeas petition within 450 days of the filing of the petition, or 60 days after it is submitted for decision, whichever is earlier, § 2266(b); requiring the court of appeals to render a final determination of any appeal within 120 days of filing of a reply or answering brief, § 2266(c); and allowing the State to "enforce a time limitation" by petitioning for a writ of mandamus to a higher court. § 2266(b)(4)(B), (c)(4)(B). If certified, a State may assert that it is entitled to these provisions retroactively to the date the Attorney General finds the State's assigned counsel mechanism satisfied the requirements of Chapter 154. § 2265(a)(2).

In States that are not certified under Chapter 154, the structure of Chapter 153 of Title 28 is applicable to federal habeas review for individuals with state death sentences. The two chapters create a dual system with the presumption that petitions will be adjudicated under Chapter 153 unless the requirements of Chapter 154 are satisfied. Chapter 153 confers important rights, protections, and expectations that are removed by certification under Chapter 154 and its expedited

procedures. The Supreme Court has recognized that because the application of Chapter 154 changes "standards of proof and persuasion in a way favorable to a State, the statute goes beyond 'mere' procedure to affect substantive entitlement to relief." *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). As Congress contemplated that such a change would occur only if the predicates for the application of Chapter 154—that is the requirement of the appointment of adequately-compensated, competent counsel who benefited from the payment of reasonable litigation expenses in state post-conviction—were met, due process must accompany that determination. Because the determination of Chapter 154's applicability affects a petitioner's "substantive entitlement to relief," and because that relief would ultimately be predicated on a petitioner's unconstitutional conviction or sentence, the determination implicates an important liberty and, in capital cases, life interests that due process safeguards.

## II.    The Reauthorization Act transferred certification authority from federal courts to the Attorney General.

When Congress originally adopted AEDPA, it made expedited procedures available to state respondents if *a federal court* found that "the State establishe[d] by rule of its court of last resort or by statute a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in the unitary review proceedings . . . ." Pub. L. No. 104-132, § 107(a), 110 Stat. 1214 (1996). Following this, the federal courts found or observed in twenty-five[1] states that the governments were not entitled to apply the expedited procedures under Chapter 154 either because the mechanisms did not satisfy the requirements of Chapter 154 to ensure that qualified counsel and sufficient resources were provided to the petitioners to develop

---

[1] Alabama, Arizona, Arkansas, California, Florida, Georgia, Idaho, Illinois, Indiana, Louisiana, Maryland, Mississippi, Missouri, Montana, Nebraska, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington.

and pursue claims in state post-conviction proceedings[2] or it was unnecessary to evaluate the mechanism because it would not have been applicable in the petitioner's case.[3]

Subsequently, members of Congress expressed their dissatisfaction with the judicial determinations that states did not qualify for the expedited procedures for federal habeas review

---

[2] *See, e.g., Baker v. Corcoran*, 220 F.3d 276 (4th Cir. 2000) (Maryland), *cert. denied*, 531 U.S. 1193 (2001); *Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000) (Texas); *Ashmus v. Woodford*, 202 F.3d 1160 (9th Cir. 2000) (California), *cert. denied*, 531 U.S. 916 (2000); *Sexton v. French*, 163 F.3d 874 (4th Cir. 1998)*, cert. denied*, 528 U.S. 855 (1999); *Pitsonbarger v. Gramley*, 141 F.3d 728 (7th Cir. 1998); *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997) (Tennessee), *cert. denied*, 523 U.S. 1079 (1998); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (Oklahoma); *Langford v. Day*, 110 F.3d 1380 (9th Cir. 1997) (Montana); *Death Row Prisoners of Pa. v. Ridge*, 106 F.3d 35 (3rd Cir. 1997) (Pennsylvania); *Burris v. Parke*, 95 F.3d 465 (7th Cir. 1996), *amended and superceded by* 130 F. 3d 782 (7th Cir. 1997); *Carter v. Friel*, No. 2:02CV326TS, 2005 WL 1683689 (D. Utah July 18, 2005); *Palmer v. Clarke*, 293 F. Supp. 2d 1011 (D. Neb. 2003), *rev'd in part on other grounds by* 408 F.3d 423 (8th Cir. 2005); *Brown v. Puckett*, 2003 WL 21018627 (N.D. Miss. 2003); *Noel v. Norris*, 194 F. Supp. 2d 893, n.47 (E.D. Ark. 2002); Order, *Brown v. Lambert*, No. C01-715C (W.D. Wash. Sept. 6, 2001); *Tillman v. Cook*, 25 F. Supp. 2d 1245 (D. Utah 1998), *aff'd*, 215 F.3d 1116 (10th Cir.), *cert. denied*, 531 U.S. 1055 (2000); *Mills v. Anderson*, 961 F. Supp. 198 (S.D. Ohio 1997); *Scott v. Anderson*, 958 F. Supp. 330 (N.D. Ohio 1997); *Wright v Angelone*, 944 F. Supp. 460 (E.D. Va. 1996); *Hill v. Butterworth*, 941 F. Supp. 1129 (N.D. Fla. 1996) (Florida), *rev'd for lack of a case or controversy*, 147 F.3d 1333 (11th Cir. 1998); *Williams v. Cain*, 942 F. Supp. 1088 (W.D. La. 1996), *rev'd on other grounds*, 125 F.3d 269 (5th Cir. 1997), *cert. denied*, 525 U.S. 859 (1998); *Martinez High v. Turpin*, 14 F. Supp. 2d 1358, 1365 n.6 (S.D. Ga. 1998), *aff'd* 209 F.3d 1257 (11th Cir. 2000), *cert. denied*, 532 U.S. 909 (2001); *see also Bell v. Haley*, 437 F. Supp. 2d 1278, 1280 (M.D. Ala. 2005) (noting the state's response to the court that "no court has ruled that Alabama has satisfied the opt-in provisions");; *Leavitt v. Arave*, 927 F. Supp. 394, 396 (D. Idaho 1996) ("[T]he court does not understand either party to argue that at the time of the petitioner's state proceedings the State of Idaho had in place procedures sufficient to meet the requirements of the new chapter 154.").

[3] *See, e.g., Tucker v. Catoe*, 221 F.3d 600 (4th Cir.), *cert. denied*, 531 U.S. 1054 (2000); *Kreutzer v. Bowersox*, 231 F.3d 460 (8th Cir. 2000), *cert. denied*, 534 U.S. 863 (2001). In *Spears v. Stewart*, 283 F.3d 992 (9th Cir. 2002), the Court found that Arizona's *prior* postconviction capital counsel mechanism satisfied the requirements of Chapter 154 but that expedited procedures would not apply in petitioner's case because Arizona did not appoint postconviction counsel for him in conformity with its mechanism. Arizona's mechanism has since been revised.

of capital sentences and Congress amended Chapter 154.[4] Some members of Congress asserted that federal courts were unable to be "disinterested" because applying the expedited procedures under Chapter 154 would affect their deadlines and workload, and asserted that the Attorney General could be a disinterested decision maker.[5] Despite courts' reasoned rulings about whether states were entitled to the opt-in provisions, Congress removed from the federal courts the power to determine whether a state could invoke the expedited review procedures, transferring that authority to the Attorney General, who now possesses the power to certify that jurisdictions qualify. *See* USA PATRIOT Improvement and Reauthorization Act of 2005 ("Reauthorization Act"), Pub. L. No. 109-177, § 507(c)(1).

The Attorney General's certification is a necessary prerequisite decision to a habeas court's determination in an individual case that the state's mechanism proposed applied in that case. *See* 28 U.S.C. § 2261(b)(1). Under the amended scheme, the Attorney General determines "whether the State has established a mechanism for the appointment, compensation, and payment of reasonable litigation expenses of competent counsel in State postconviction proceedings brought

---

[4] *See, e.g.*, 152 Cong. Rec. S1598, 1620-28, 1621, 1625 (Mar. 2, 2006) (statement of Sen. Kyl) (criticizing the "Federal habeas system" and declaring that what victims and their families "have experienced at the hands of the Federal courts should offend every American" and explaining that "ADEPA left the decision of whether a State qualified for the incentive to the same courts that were impacted by the time limits. This has proven to be a mistake"); 151 Cong. Rec. E2639-40, E2639 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 (stating that the Reauthorization Act § 507(c)(1) "gives States a real chance to qualify for chapter 154 treatment" and, with respect to why the Arizona had not qualified for chapter 154 procedures, stated that "The problem is simple: under current law, the local Federal court of appeals decides whether a State has opted in to chapter 154").

[5] *See, e.g.*, 151 Cong. Rec. E2639-40, E2640 (Dec. 22, 2005) (statement of Rep. Flake), 2025 WL 3501657 ("The trouble with chapter 154 is that the courts assigned to decide when it applies are the same courts that would be bound by the chapter's strict deadlines if a State is found to qualify. Simply put, the regional courts of appeals have a conflict of interest. They decide whether the States are entitled to a benefit which places a burden on the courts themselves.").

by indigent [capital] prisoners," "the date on which the mechanism" was established, and whether the State "provides standards of competency for the appointment of counsel in [these] proceedings." 28 U.S.C. § 2265(a)(1).

Chapter 154 also authorizes the Attorney General to "promulgate regulations to implement the certification procedure," which included defining key provisions such as "competent counsel," "reasonable resources," and "adequate" litigation resources. 28 U.S.C. § 2265(b). Chapter 154 purports to bind federal courts by preventing a federal court in an individual case from reviewing any of those determinations respecting the state's mechanism.

Under Chapter 154, the Court of Appeals for the D.C. Circuit has "exclusive jurisdiction" to review the determination, under a *de novo* standard of review. 28 U.S.C. § 2265(c)(2), (3). Review is governed by the Hobbs Administrative Orders Review Act, codified at 18 U.S.C. § 19511. *See* 28 U.S.C. § 2265(c)(1). That Court's judgment is appealable to the U.S. Supreme Court. *See* 28 U.S.C. § 2265(c)(2); 28 U.S.C. § 2350(a).

Prior to 2025 (and prior to the effective date of the 2013 Final Rule), only two states, Texas and Arizona, had submitted applications for certification to the Attorney General; neither state is certified. Complaint, ¶¶ 31-33. Of note, during the public comment period for Arizona's application, DOJ received 140 comments opposing certification. *See* DOJ Docket ID DOJ-OLP-2017-0009, at https://www.regulations.gov/docket/DOJ-OLP-2017-0009 (last visited Sept. 23, 2025). The Federal Public Defender for the District of Arizona supported its opposition with twenty exhibits demonstrating the deficiencies in the Arizona mechanism. In response to the application by Texas, DOJ received 46 public comments, the most extensive of which was a 247-page comment submitted by the Texas Defender Offices and supported by 134 exhibits. *See* DOJ Docket ID DOJ-OLP-2017-0010, *available at* https://www.regulations.gov/docket/DOJ-OLP-

9

2017-0010 (last visited Sept. 25, 2025). Texas's application has remained pending for over seven years.

### III.     Tennessee seeks Chapter 154 certification.

Tennessee submitted its application on June 6, 2025, seeking certification by the Attorney General that the state's assigned counsel mechanism satisfied Chapter 154's requirements as of October 23, 1995. Plaintiffs must engage in this pre-certification challenge to the Attorney General's process to preserve their constitutional, administrative, and substantive challenges to the procedures for certification and the States' application—or risk forgoing their opportunity to seek judicial review of their claims by the Court of Appeals for the D.C. Circuit pursuant to 28 U.S.C. § 2265(c) and Chapter 158 of Title 28. As result of their coerced participation in an administrative process that itself violates constitutional mandates, Plaintiffs have been placed under a heavy burden. As the requests for an extension of time by the counsel for death-sentenced individuals, the FDSET, TNM-CHU, and OPCD explain, providing substantive public comments to enable Plaintiffs to challenge a certification determination requires substantial work. [6]

---

[6] *See* Gutierrez Decl. Ex. 4, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Petition for extension of Time to Comment, Federal Defender Services of Eastern Tennessee, Sept. 3, 2025 ("Ferrell Letter") (counsel for Plaintiff Howard Hawk Willis); Gutierrez Decl. Ex 5, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of time, Federal Public Defender for the Middle District of Tennessee, Sept. 9, 2025 ("Henry Letter") (counsel for Plaintiff Andre Bland); Gutierrez Decl. Ex. 6, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of Time to Comment, Office of the Post-Conviction Defender for the State of Tennessee, Sept. 11, 2025 ("Scalpone Letter Sept. 11, 2025") (counsel for Plaintiff Urshawn Miller); Gutierrez Decl. Ex. 7, Comment on OLP180 Tennessee Capital Counsel Mechanism 90 FR 38182 – Request for extension of time, Office of the Post-Conviction Defender for the State of Tennessee, Sept. 19, 2025 ("Scalpone Letter Sept. 19, 2025"). The public comments are published at Regulations.gov under Docket ID no. DOJ-OLP-2025-0202, *available at* https://www.regulations.gov/docket/DOJ-OLP-2025-0202 (last visited Sept. 26, 2025).

For example, when the DOJ issued its Notice of Request for Certification for Tennessee on August 7, 2025, it invited interested parties to submit comments on or before October 6, 2025. *See* Gutierrez Decl. Ex. 4 (Ferrel Letter); Gutierrez Decl. Ex. 5 (Henry Letter); Gutierrez Decl. Ex. 6 (Scalpone Letter Sept. 11, 2025). Tennessee sought retroactive certification for a 30-year period stretching back to 1995. FDSET, TNM-CHU, and the OPCD sought a 90-day extension to submit comments, explaining that responding to this request would require "research into decades of historic development" of the capital counsel mechanism, involving access to off-site storage units, gathering county court records, potential public records requests, and interviews of persons with knowledge of Tennessee's post-conviction proceedings. Gutierrez Decl. Ex. 4, p. 2. Tennessee's failure to provide any supporting documentation to DOJ with its application increased the burden on the commentors to ensure that DOJ considered all relevant information, as required by regulation. *See* Gutierrez Decl. Ex. 5, p. 2 (describing the work required to identify and review relevant case files; conduct interviews; obtain fee vouchers for attorneys, expert requests and expert vouchers; and synthesize the data"). TNM-CHU estimated that this process would require hundreds of hours of staff time. *Id*. Furthermore, the many unsupported statements and misrepresentations in Tennessee's application required commentors to compile extensive rebuttal information. Gutierrez Decl. Ex. 6, p. 2.

The Attorney General has yet to respond to any of the requests for an extension, apparently allowing only sixty days from the August 6 notice to the October 6 deadline for public comment. This short period increases the burden on the already burdened commenting agencies that had sought it. These agencies jointly represent a majority of those on Tennessee's death row. Gutierrez Decl. Ex. 4, p. 1; Ex. 5, p. 2; Ex. 6, p. 1. The agencies' clients, during this foreshortened comment period, have continued to live under a cloud of uncertainty about the continued viability of their

litigation, as the opt-in provisions threaten to upend the decades-old timelines of many of their cases. And the additional workload created for their lawyers by the certification process has decreased the time available to litigate their ongoing cases. Gutierrez Decl. Ex. 4, p. 3.

Accordingly, Plaintiffs are in an untenable position of being coerced into participating in a biased administrative process that grants the Attorney General the power to legislate, prosecute, and adjudicate the scope of federal habeas review of their death sentences. The unconstitutional proceeding is time-consuming, resource-intensive, and redirects limited resources away from their ability to defend against their sentences of death.

## IV.    The Attorney General is the nation's chief prosecutor whose interests are aligned with States.

The Attorney General is the nation's chief prosecutor whose institutional interests have consistently aligned with the interests of law enforcement and state prosecutors, and against those of capital defendants. *See* Judiciary Act of 1789, § 35, ch. 20, 1 Stat. 73 ("And there shall also be appointed a meet person, learned in the law, to act as attorney-general for the United States, who shall be sworn or affirmed to a faithful execution of his office; whose duty it shall be to prosecute and conduct all suits in the Supreme Court in which the United States shall be concerned . . ."). *See Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985) ("As the Nation's chief law enforcement officer, the Attorney General provides vital assistance to the President in the performance of the latter's constitutional duty to 'preserve, protect, and defend the Constitution of the United States.' U.S. Const., Art. II, § 1, cl. 8.").

As the nation's chief prosecutor, the Attorney General directs the Department of Justice regularly to oppose attempts to standardize or improve criminal defense performance. In this role, the Attorney General has been a forceful legal advocate for states and law enforcement in litigation challenging state convictions in federal habeas proceedings, has repeatedly asserted a legal interest

the standards for competent counsel and interpretations of procedural rules that restrict federal habeas review, and is a consistent and close partner with state and local law enforcement.

## ARGUMENT

Plaintiffs are entitled to a temporary restraining order (TRO) or a preliminary injunction (PI), by demonstrating that: (1) they will likely succeed on the merits; (2) they will likely be irreparably harmed if relief is withheld; (3) the balance of equities tilts their way; and (4) the public interest favors injunctive relief. *Winter*, 555 U.S. at 20; *see also Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025). The balance of equities and the public interest factors merge when the government is the opposing party. *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020). The standards for temporary restraining orders and preliminary injunctions are the same. *Doe v. McHenry*, No. 1:25-cv-286-RCL, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025).

Courts in this Circuit have traditionally used a sliding scale to apply these factors, allowing a stronger showing on some factors to compensate for a weaker showing on others. *See id.* The Court of Appeals has suggested, but not decided, that a likelihood of success on the merits may be required in every case. *See Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (citing *Winter*, 555 U.S. at 20–22*)*. Under either approach, Plaintiffs satisfy all four standards and are entitled to a TRO.

## I.    This Court has jurisdiction to hear the Plaintiffs' constitutional claims.

This Court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Encompassed in that authority is the power to issue injunctions to prevent unconstitutional acts. *See Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010). Equitable relief "has long been recognized as the proper means for preventing entities from acting unconstitutionally."

*Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001); *see also Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.").

As the Supreme Court reaffirmed in *Axon*, 598 U.S. at 185-86, even though most challenges to administrative agencies' actions "follow a well-trod path" of administrative exhaustion and judicial review of the administrative decision, *Axon*, 598 U.S. at 180, federal district courts retain jurisdiction under § 1331 to decide collateral, constitutional claims that challenge the structure and authority of an agency's decision making power. *See Axon*, 598 U.S. at 186; *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *see also* Brian M. Lipshutz, *Bypassing Agency Adjudication*, 103 Wash. U.L. __ (2026) (forthcoming) (discussing cases involving statutory and constitutional challenges to non-final agency actions). Plaintiffs' claims under Article III and the Fifth Amendment, which challenge the Attorney General's authority as an administrative decision maker in the certification process, therefore fall under this court's jurisdiction. The subsequent administrative review in the Court of Appeals provided by 28 U.S.C. § 2265(c) is insufficient to remedy the Plaintiffs' here-and-now injury of having to engage in and exhaust an unconstitutional administrative process to preserve their ability to raise their collateral and substantive challenges the Attorney General's certification in the court of appeals. *See Axon*, 598 U.S. at 191 (noting that "it is impossible to remedy once the proceeding is over" on appeal the harm afflicted by having to undergo an unconstitutional process).

Under the three-part test in *Thunder Basin*, the relevant factors weigh in favor of finding that the Plaintiffs' claims are not of a "type [that] Congress intended to be reviewed [solely] within [Chapter 154's] statutory scheme." *Free Enterprise Fund*, 561 U.S. at 489. First, although precluding district court jurisdiction of Plaintiffs' claims still allows for review of the Attorney

General's certification decision in the court of appeals, that review will not be a "meaningful" review of Petitioners' collateral constitutional claims. *Id*. at 490. As an administrative agency, the Attorney General has no statutory or regulatory authority to adjudicate or remedy constitutional violations and has admitted as much with respect to the claims raised by the Plaintiffs.[7] Therefore, the Attorney General will have no capacity to make the fact-findings necessary to decide whether the Attorney General itself is a biased decision-maker or whether its processes invade the province of Article III habeas courts. It will not issue a reasoned decision on those claims for the Court of Appeals to review. For plenary adjudication of their claims, Plaintiffs will be required to undergo the very harm they seek to avoid: the burden of their counsel's preparing public comments that preserve the administrative records for their subsequent judicial review challenging the Attorney General's substantive decision (which will only address the adequacy of the state's mechanism and not the constitutional claims). Then Plaintiffs will need to seek judicial review; move before the court of appeals under 28 U.S.C. § 2347(b)(3) for a further plenary hearing in the appropriate district court to supplement the record relevant for their collateral claims; conduct the hearing on the collateral claims in the district court; and return to the court of appeals for decision. Throughout this process, both the institutional and individual Plaintiffs suffer an on-going harm and all the while their ability to prepare for their federal habeas review is severely compromised. This is a far cry from a meaningful review of the facial constitutional challenges to Chapter 154 itself.

Second, Plaintiffs' constitutional claims are "wholly collateral" to any order by the Attorney General certifying a state mechanism for postconviction counsel. *Thunder Basin*, 510

---

[7] *See* 78 Fed. Reg. 58160, 58163 (Sept. 23, 2013) ("As an initial matter, the Attorney General cannot refrain from carrying out the functions assigned to him by chapter 154: The law requires him to discharge those functions.").

U.S. at 212. As noted above, Plaintiffs' Due Process claims arise from the Attorney General's institutional bias, and dual roles as a rule maker and adjudicator. None of these issues relate to the underlying merit of Tennessee's application for certification. Plaintiffs' objections to the decision-making authority and procedures under Chapter 154, and its "general challenges are 'collateral' to any [agency] orders or rule from which review may be sought." *Free Enterprise* 561 U.S. at 489.

Third, the Attorney General lacks "competence and expertise" in relation to Plaintiffs' constitutional claims alleging institutional bias on behalf of the Attorney General itself and encroachment upon the judiciary's Article III authority. It cannot properly adjudicate either its own non-impartiality or its own overreach of its Article II authority. As the Attorney General has acknowledged, consideration of the Plaintiffs' constitutional challenges is beyond the scope of the office's authority under Chapter 154. *See* 78 Fed. Reg. 58160, 58163 (Sept. 23, 2013).

Although *de novo* review in the Court of Appeals is available, even "if the factors point in different directions," jurisdiction in this Court under § 1331 is still appropriate when the statutory review scheme, though exclusive where it applies, cannot meaningfully reach the claim in question. *Axon*, 598 U.S. at 186. Plaintiffs should not be required to undergo the very harm they seek to avoid, or work their way through a cumbersome and inadequate procedural maze, in order to vindicate their constitutional claims and safeguard their rights to federal habeas review in the district court.

## II. Plaintiffs are likely to prevail on the merits of their Fifth Amendment Due Process Claim.

The Fifth Amendment ensures that no person "is deprived of life, liberty, or property without due process of law." U.S. Const. amend. V; *see also Aref v. Lynch*, 833 F.3d 242, 252 (D.C. Cir. 2016).

### A. The Attorney General is an unconstitutionally biased decisionmaker concerning the Chapter 154 certification for Tennessee.

Due process guards individual liberty by ensuring that the government provides certain procedural protections when making decisions that will affect a person's rights. U.S Const. Amend. V. Besides requiring other protections, due process requires the neutrality of government decision makers. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The Due Process Clause entitles a person to an impartial and disinterested tribunal . . . ."); *see also Williams v. Pennsylvania*, 579 U.S. 1 (2016); *Caperton v. Massey*, 556 U.S. 868 (2009); *In re Murchison*, 349 U.S. 133 (1955). While the concept is "flexible" and turns on what a "particular situation demands," it embodies key values including accuracy, fairness, the appearance of fairness, equality, predictability, transparency, and rationality. *Schweiker v. McClure*, 456 U.S. 188, 200 (1982) (internal quotation omitted).

When assessing bias, courts must determine whether "the nature of one's position or the relationship between that position and the outcome of adjudications disqualifies a person from serving with the impartiality mandated by the Due Process Clause." *Powell v. Ward*, 542 F.2d 101, 103 (2d Cir. 1976). Due process is violated when an adjudicator has "substantial" interest in the outcome of a case. *Tumey v. Ohio*, 273 U.S. 510, 523 (1927); *see also Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley*, 114 F.3d 840, 844 (9th Cir. 1997) (noting that due process is violated "where the decisionmaker, because of his institutional responsibilities, would have 'so strong a motive' to rule in a way that would aid the institution" (internal citation omitted)); *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (under a statute that required the Attorney General to certify plaintiff was injured in the scope of employment – where the result was to shield the government from liability – the Attorney General "[i]nevitably … will feel a strong tug to certify, even when the merits are cloudy" and "his interest would certainly bias his judgment") (internal quotation omitted).

When reviewing bias claims in the administrative context, courts accord decision makers a "presumption of honesty and integrity." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *cf. Perales v. Richardson*, 402 U.S. 389, 403 (1971) ("The vast workings of the social security administrative system make for reliability and impartiality" so that the agency is not "an advocate or adversary"). However, "[t]his presumption can be rebutted by . . . establishing a disqualifying interest." *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). Where an official's executive responsibilities create partisan pressure on his or her adjudicatory responsibilities, there exists "a 'situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law.'" *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 60 (1972) (quoting *Tumey*, 273 U.S. at 534); *In re Oliver*, 333 U.S. 257, 278 (1948) (Rutledge, J., concurring) (finding a due process violation where a state's grand-jury scheme "combines in a single official [] historically separate powers"); *Harrison v. McBride*, 428 F.3d 652, 669 (7th Cir. 2005) (decisionmakers show bias in violation of due process when they "forsake the role of impartial arbiter and instead assume the role of advocate"); *Abdulrahman v. Ashcroft*, 330 F.3d 587, 596 (3d Cir. 2003) (noting that due process requires administrative decisionmakers "to function as neutral and impartial arbiters" and "assiduously refrain from becoming advocates for either party") (internal quotations omitted); *Walker v. City of Berkeley*, 951 F.2d 182, 185 (9th Cir. 1991) (ruling that due process is violated by "allowing the same person to serve both as decisionmaker and as advocate for the party that benefited from the decision"); *Trans World Airlines, Inc. v. Civil Aeronautics Bd.*, 254 F.2d 90, 91 (D.C. Cir. 1958) ("The fundamental requirements of fairness in the performance of [quasi-judicial] functions require at least that one who participates in a case on behalf of any party . . . take no part in the decision of that case by any tribunal on which he may thereafter sit."). This risk

18

of institutional bias is greater when governing statutes do not impose limits on the agency's decision-making, as is the case under Chapter 154 where the Attorney General is serving in a rule-making and standard setting capacity when promulgating regulations, rather than following set statutory limitations. *See Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395, 1407 (4th Cir. 1995) (institutional bias may occur when agency interest is not limited by statutory restrictions).

A decisionmaker's prior involvement in or prejudgment regarding the issues central to a determination may also violate due process. For example, an agency decision maker violated due process rights to an impartial tribunal when he filed a brief involving a dispute before the Civil Aeronautics Board and then later became a member of that Board and participated in the resolution of the dispute. *Trans World Airlines, Inc. v. Civil Aeronautics Bd.*, 254 F.2d 90 (D.C. Cir. 1958); *Texaco, Inc. v. FTC*, 336 F.2d 754, 760 (D.C. Cir. 1964) (holding unconstitutional bias present when, while the hearing was pending, the FTC chair made a speech in which he named Texaco in connection with a statement of practices alleged in the complaint); *see also Williams v. Pennsylvania*, 579 U.S. 1 (2016) (unconstitutional bias where former District Attorney who made decision to seek death sentence later sat on court reviewing that same sentence).

Further, the Court has asserted a "heightened concern for fairness and accuracy that has characterized [the Court's] review of the process requisite to the taking of a human life." *Ford v. Wainwright*, 477 U.S. 399, 414 (1986). Accordingly, in this context, the determination of a state's certification application—the required step before the truncated procedures under Chapter 154 are applied and the state's taking of a human life is expedited—must be free of actual or perceived bias. It is not.

Section 2265 violates the right to due process enshrined in the Fifth Amendment by vesting authority in the Attorney General to determine certification applications. The Attorney General is

19

unable to act with sufficient independence and neutrality to fulfill the constitutional guarantee of structural due process for three reasons. *First,* the Attorney General demonstrated substantial, institutional interests in the legal outcome of the certification determination in three ways, namely: (1) consistent amicus advocacy for common interests in federal habeas review of state convictions, in favor of the state and against the interest of the individuals on state death rows; (2) legal interests in establishing lower standards for the competency of trial counsel, adequate litigation resources for state postconviction cases; and standards for competency of state postconviction counsel; and (4) legal interests in procedural rules that restrict access to federal habeas review. *Second,* the Attorney General maintains a close partnership with States and state law enforcement, and consequently cannot neutrally and disinterestedly assess a State's application for certification. *Thirdly* the Attorney General's dual role as a prosecutor and adjudicator creates a high probability of actual bias.

**B. The Attorney General's substantial legal interests in federal habeas challenges to state convictions is aligned with the interests of states and against habeas petitioners.**

As the Attorney General has stated, the law governing the 28 U.S.C. § 2255 petitions which the Attorney General opposed is substantively similar to and informed by law governing federal habeas corpus proceedings challenging state convictions. See Brief for the United States as Amicus Curiae Supporting Petitioner (Warden), *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1 (arguing in state ineffective assistance of counsel case that "similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards."). The Attorney General has repeatedly asserted these institutional interests as an amicus curiae and advocate in the capital and habeas corpus context, including in cases involving

constitutional challenges to the effectiveness of trial counsel.[8] Moreover, the Supreme Court has

recognized the Attorney General's substantial interest in § 2254 cases by inviting the Solicitor

---

[8] See, for example, Briefs of United States as Amicus Curiae in *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in Section 2254 proceedings . . . ."); *Day v. Crosby*, 2006 WL 139213 ("the Court's decision in this case will influence, if not control, the resolution of cases presenting similar questions under 28 U.S.C. § 2255. See, *e.g., United States v. Bendolph,* 409 F.3d 155 (3d Cir. 2005) (en banc). The United States therefore has a significant interest in this case.") (opinion at *Day v. McDonough*, 547 U.S. 198 (2006)); *Mayle v. Felix*, 2005 WL 435884 ("Because the Court's ruling will apply to collateral attacks on federal criminal judgments, the United States has a substantial interest in the outcome of this case.") (opinion at *Mayle v. Felix*, 545 U.S. 644 (2005)); *Rompilla v. Beard*, 2004 WL 2945403 ("Although this case involves a claim by a state prisoner under 28 U.S.C. § 2254, the Court's analysis will likely affect federal prisoners' ineffectiveness claims under 28 U.S.C. § 2255. The United States therefore has a substantial interest in the resolution of the question presented. The government has previously participated in numerous cases raising similar ineffective assistance of counsel questions.") (opinion at *Rompilla v. Beard*, 545 U.S. 374 (2005)); *Medellin v. Dretke*, 2005 WL 504490 ("The President, through subordinate Executive Branch officials, represents the United States in ICJ proceedings and in the United Nations (U.N.), and he has the lead role in determining whether, and if so, how, to comply with the determinations of such international bodies. The United States also has a substantial interest in the interpretation and effect given to international instruments to which it is a party.") (opinion at *Medellin v. Dretke*, 544 U.S. 660 (2005)); *Dretke v. Hayle*, 2003 WL 22970602 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the actual innocence exception applies in the same manner to collateral attacks by both federal and state prisoners. The United States has a substantial interest in the outcome of this case…") (opinion at *Dretke v. Haley*, 541 U.S. 386 (2004)); *Wiggins v. Smith*, 2003 WL 470211 ("The United States has a substantial interest in the resolution of the question on which the Court granted *certiorari*, because claims of ineffective assistance of counsel are frequently asserted on collateral review in federal criminal cases. Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision will affect ineffectiveness claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Wiggins v. Smith*, 539 U.S. 510 (2003)); *Bell v. Cone*, 2002 WL 122621 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision is also likely to affect ineffective-assistance-of-counsel claims brought by federal prisoners under 28 U.S.C. § 2255.") (opinion at *Bell v. Cone*, 535 U.S. 685 (2002)); *Mickens v. Taylor*, 2001 WL 1056945 ("Although this case involves a state prisoner seeking relief under 28 U.S.C. § 2254, the Court's decision likely will affect ineffective-assistance claims brought by federal prisoners under 28 U.S.C. § 2255 as well.") (opinion at *Mickens v. Taylor*, 535 U.S. 162 (2002)); *Roe v. Flores-Ortega*, 1999 WL 33611343 ("This case involves the proper standards for evaluating a claim that

General to submit amicus curiae briefs in cases involving the interpretation of § 2254. See, e.g., *Slack v. McDaniel*, 1999 WL 1223771 ("The Court has invited the Solicitor General to express the views of the United States on the following questions.") (opinion at *Slack v. McDaniel*, 529 U.S. 473 (2000)); and *Felker v. Turpin*, 1996 WL 284697 ("The United States has an important interest in the resolution of those issues. In the Court's order granting *certiorari* and specifying the questions to be briefed, the Court invited the Solicitor General to file a brief expressing the views of the United States.") (opinion at *Felker v. Turpin*, 518 U.S. 651 (1996)). Accordingly, the Attorney General has a substantial interest in the outcome and relevant legal standards in federal habeas corpus proceedings challenging state convictions, and has sided with the States' interpretations.

---

respondent's constitutional right to counsel was violated when his lawyer failed to perfect an appeal from the state court judgment entered on his plea of guilty. Because similar collateral attacks on federal criminal judgments will generally be adjudicated under the same standards, the United States has a substantial interest in the outcome of this case.") (opinion at *Roe v. Flores-Ortega*, 528 U.S. 470 (2000)); *Hopkins v. Reeves*, 1997 WL 720441 ("The Court's resolution of that question could affect the jury instructions given in federal capital proceedings.") (opinion at *Hopkins v. Reeves*, 524 U.S. 88 (1998)); *Strickland v. Washington*, http://www.usdoj.gov/osg/briefs/1983/sg830192.txt ("Claims of ineffective assistance of counsel are raised with increasing frequency in federal criminal cases, and the principles laid down in this case are likely to govern the disposition of such claims.") (opinion at *Strickland v. Washington*, 466 U.S. 668 (1984)); and *Engle v. Isaac*, 1981 WL 389902 ("The standard for determining when an error that was not duly objected to at trial or raised on direct appeal can nevertheless support collateral relief is of substantial importance to the administration of justice in the federal system. The holding of the court of appeals in these cases-that the assumed futility of objection constitutes sufficient cause to excuse a failure to make timely objection-would, if sustained by this Court, substantially increase the susceptibility of otherwise final judgments in federal criminal cases to collateral attack.") (opinion at *Engle v. Isaac*, 456 U.S. 107 (1982)).

### 1. The Attorney General's amicus advocacy overwhelmingly supports the states because of their common legal interests.

Since 2000, the Attorney General, through the Solicitor General's Office, has inserted itself into state prisoner habeas cases over twenty times.[9] It has done so overwhelmingly on the side of the States, arguing against the challenges to state convictions and sentences and never in support of the petitioners. In cases in which the Attorney General moved to file a brief as *amicus curiae*, it stated an interest in the outcome because "similar collateral attacks on federal criminal judgements will generally be adjudicated under the same standards." *See*, *e.g.*, Brief for the United States as Amicus Curiae Supporting Petitioners (Director, Arizona Department of Corrections), *Ryan v. Gonzales*, 568 U.S. 57 (2013) (arguing that "[s]ection 3599 does not expressly create a right to be competent to assist counsel" and "[w]hen a capital prisoner's claims can be fairly litigated without his assistance, a competency-related stay would be difficult to justify. That will usually be the case in Section 2254 proceedings . . . ."); Brief for the United Sates as Amicus

---

[9] *See Kahler v. Kansas*, 589 U.S. 271 (2020) (constitutional requirements of insanity test); *Kansas v. Carr*, 577 U.S. 108 (2016) (joint penalty phrase trials); *Ryan v. Gonzales*, 568 U.S. 57 (2013); *Whorton v. Bockting*, 549 U.S. 406 (2007) (retroactivity of *Crawford v. Washington*); *Burton v. Stewart*, 549 U.S. 147 (2007) (non-retroactivity of *Blakely v. Washington*); *Day v. McDonough*, 547 U.S. 198 (2006) (timeliness of petition); *Hill v. McDonough*, 547 U.S. 573 (2006) (timeliness of petition); *Mayle v. Felix*, 545 U.S. 644 (2005) (timeliness of petition); *Gonzalez v. Crosby*, 545 U.S. 524 (2005) (timeliness of petition); *Rompilla v. Beard*, 545 U.S. 374 (2005) (IAC); *Medellin v. Dretke*, 544 U.S. 660 (2005) (Vienna Convention); *Florida v. Nixon*, 543 U.S. 175 (2004) (IAC); *Dretke v. Haley*, 541 U.S. 386 (2004) (actual innocence in sentencing of non-capital petitioner); *Yarborough v. Alvarado*, 541 U.S. 652 (2004) (voluntariness of confession); *Schriro v. Summerlin*, 542 U.S. 348 (2004) (non-retroactivity of *Ring v. Arizona*); *Price v. Vincent*, 538 U.S. 364 (2003) (double jeopardy); *Wiggins v. Smith*, 539 U.S. 510 (2003) (IAC); *Bell v. Cone*, 535 U.S. 685 (2002) (IAC); *Mickens v. Taylor*, 535 U.S. 162 (2002) (trial attorney conflict of interest); *Tyler v. Cain*, 533 U.S. 656 (2001) (successive petitions); *Slack v. McDaniel*, 529 U.S. 473 (2000) (AEDPA's applicability to appeals of non-AEDPA petitions); *Roe v. Flores-Ortega*, 528 U.S. 470 (2000) (IAC); and *Portuondo v. Agard*, 529 U.S. 61 (2000) (prosecutorial misconduct).

Curiae Supporting Petitioner (Warden), *Roe v Flores-Ortega*, 528 U.S. 470 (2000) (No. 98-1441), 1999 WL 33611343, at *1.

Relatedly, in all the cases where the Attorney General has filed in support of a party, the Attorney General has advocated for the state and against the habeas petitioner. The Attorney General does not file in support of the petitioner; in a few cases, it has filed briefs in support of neither party.[10] The Attorney General has argued for lower quality counsel for state defendants, and for tighter procedural restrictions on federal habeas to state prisoners. The Attorney General has never argued that a state petitioner received ineffective assistance of trial counsel. Not once has the Attorney General argued that a particular petitioner's case fits within the procedural guidelines of § 2254 and ought to be heard, instead persistently urging the Court to dismiss or deny petitions on procedural grounds.

Considering the number of times the Attorney General has chosen to express interests that are oppositional to the interest of state prisoners who are seeking habeas relief, the Attorney General cannot be regarded as a disinterested decision maker in habeas matters.

### 2. The Attorney General has consistently argued for lower standards of effective assistance of defense counsel.

The Attorney General has submitted a number of amicus briefs in the United States Supreme Court in cases specifically involving ineffective assistance of counsel arising from habeas corpus petitions challenging state convictions. *See, e.g., Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Bell v. Cone*, 535 U.S. 685 (2002); *Mickens v. Taylor*, 535 U.S. 162 (2002); *Roe v. Flores-Ortega*, 528 U.S. 470

---

[10] *See Ramirez v Collier*, 596 U.S. 411 (2022)*; Shoop v. Twyford*, 596 U.S. 811 (2022)*; and Nance v. Ward*; 597 U.S. 159 (2022).

(2000); *Strickland v. Washington*, 466 U.S. 668 (1984). In every such case the Attorney General has opposed the petitioner's claim of ineffective assistance of counsel and urged a less rigorous standard of performance or denial of relief. *See* Briefs for the United States as Amicus Curiae*: Ryan v. Gonzales*, 568 U.S. 57 (2013); *Rompilla v. Beard*, 2004 WL 2945403; *Wiggins v. Smith*, 2003 WL 470211; *Bell v. Cone*, 2002 WL 122621; *Mickens v. Taylor*, 2001 WL 1056945; *Roe v. Flores-Ortega*, 1999 WL 33611343; and *Strickland v. Washington*, 466 U.S. 668 (1984).

Two cases in which the Supreme Court ruled that trial counsel was constitutionally ineffective, illustrate that the Attorney General has argued forcefully for both the denial of habeas relief and for what the Court determined to be unconstitutionally low standards for defense representation. *See, e.g.*, Brief for the United States as Amicus Curiae Supporting Respondent (Secretary, Pennsylvania Department of Corrections), *Rompilla v. Beard*, 545 U.S. 374 (2005) (No. 04-5462), 2004 WL 2945403, at *30 (arguing, unsuccessfully, that counsel was not deficient for failing to obtain and review records regarding prior convictions that were used in aggravation during the penalty phase because such records "were simply not relevant"); Brief for the United States as Amicus Curiae Supporting Respondent (Warden), *Wiggins v. Smith*, 539 U.S. 510 (2003) (No. 02-311), 2003 WL 470211, at *17 (arguing, unsuccessfully, that there was no applicable "standard for counsel's duty to investigate a capital defendant's background[, n]or should any such quasi-mandatory duty be created").

In both cases the Supreme Court rejected the Attorney General's position. *See Rompilla*, 545 U.S. at 385, n.3 ("[T]he United States, arguing as an *amicus* in support of Pennsylvania, maintained that counsel had fulfilled their obligations to investigate the prior conviction by obtaining the rap sheet. Tr. of Oral Arg. 44-45. But this cannot be so. The rap sheet would reveal only the charges and dispositions, being no reasonable substitute for the prior conviction file.");

25

*Wiggins*, 539 U.S. at 532 (concluding that the United States was incorrect in arguing that counsel who failed to investigate petitioner's life history beyond obtaining a presentence investigation report and department of social services records satisfied prevailing professional standards for defense counsel). In both cases, the Attorney General opposed the positions of state capital defendants and sought unsuccessfully to lower the bar for what constitutes competent defense representation.

### 3. The Attorney General has consistently argued for interpretation of procedural rules that would restrict habeas review.

On several occasions in federal habeas cases challenging state convictions, the Attorney General has argued for interpretations of habeas law that impose greater procedural restrictions on federal habeas petitioners.

In *Day v. McDonough*, 547 U.S. 198 (2006), for example, the Supreme Court decided that federal district courts are permitted, although not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition, but only if the court accords the parties fair notice and an opportunity to present their positions. *Id*. at 209. The Attorney General moved to file a brief as *amicus curiae*, inserting itself into the case to argue that the rules of habeas procedure do not divest district courts of an "independent authority to abide by the limitations on habeas review." Brief for United States as *Amicus Curiae*, 2006 WL 139213, *6. The Attorney General encouraged the Court to place a higher value on the "disposition" of petitions than on the essence of a petitioner's claim, arguing that "the State's act of filing a response in this case, even one that erroneously conceded that the petition was timely, did not deprive the district court of its authority to enforce the limitations period that Congress has adopted to promote the prompt filing and disposition of habeas corpus petitions." *Id.* at 2006 WL 139213, *6.

In *Mayle v. Felix*, 545 U.S. 644 (2005), the Court held that petitioner's amended petition, filed after the one-year federal habeas limitations period and targeting his statements in a pretrial interrogation, did not (as the petitioner maintained) relate back to the date of the original petition, which challenged the admission of a prosecution witness's videotaped testimony. The Attorney General filed an *amicus* brief arguing that a state prisoner "cannot rely on the doctrine of relation back, under Federal Rule of Civil Procedure 15(c)(2), to render timely under the AEDPA's limitation period an otherwise untimely amendment to an original habeas petition, when the amendment articulates new grounds for relief and supporting facts that differ from those alleged in the original petition." Brief for United States as *Amicus Curiae*, 2006 WL 435884, *7. The Attorney General here again argued for limiting review of a state prisoner's federal habeas petition.

In *Engle v. Isaac*, 456 U.S. 107 (1982), the Attorney General, as *amicus curiae* urged the Court to deny federal habeas corpus review and relief of a substantively valid claim that involved a procedural default. The Attorney General argued that unless there was a finding of constitutionally ineffective assistance of trial counsel, "there is certainly no justification for refusing to permit the state to enforce its procedural default rule." Brief for the United States as Amicus Curiae, 1981 WL 389902, *21. The case repeats the consistent pattern of the Attorney General's efforts to limit habeas review. *See also* Brief of the United States as *Amicus Curiae*, 2003 WL 22970602, *16-19 in *Dretke v. Haley*, 541 U.S. 386, 393-94 (2004) (where the Attorney General urged the Court to hold that an actually innocent non-capital offender should not be granted the "actual innocence" exception to procedural default of a constitutional claim of sentencing error for efficiency, and the Court declined).

As the Attorney General's advocacy as an *amicus* in federal habeas cases challenging state convictions demonstrates, the Attorney General has—perhaps understandably—been an interested

advocate: the chief prosecutor, not an impartial decision maker. Moreover, the Attorney General has exclusively advocated in support of the state and in opposition to the petitioner, or on behalf of no party. Not only is the Attorney General a consistent advocate for one side, but unlike agencies delegated administrative power, there is also no adjudicatory aspect to the office's activities. The Attorney General, in the context of federal habeas, is an advocate and only an advocate, and that advocacy is entirely for one side. When required to make a decision as under the Reauthorization Act amendment, in the very same context in which the office has so consistently played the role of an advocate, it is impossible to imagine that the Attorney General will not continue to favor the side that the office has always favored in the past and, at a minimum, the great risk of appearance of bias. Moreover, the impact of the Attorney General's unconstitutional bias is compounded by the broad delegation of discretion to define the standards under which the office will assess a state's application.

### C. The Attorney General is a consistent partner with state law enforcement and cannot neutrally judge a state's compliance with Chapter 154.

In addition to asserting aligned legal positions in litigation, the Attorney General also works in partnership with state prosecutors to further their common litigation interests, consistent with the office's responsibilities as the chief law enforcement officer for the nation. *See Mitchell*, 472 U.S. at 520. For example, under the leadership of the Attorney General, Department of Justice officials are members of the Association of Government Attorneys in Capital Litigation ("AGACL"), an association of state and federal prosecutors. *See History*, Association of Government Attorneys in Capital Litigation, http://agacl.com/history/ (last visited Aug. 12, 2025). In addition to an annual conference and other training projects, the AGACL is involved in developing a brief bank, in conjunction with the National District Attorneys Association, National

Association of Prosecutor Coordinators, and the National Association of Attorney's General, to be shared among state and federal prosecutors.

The partnership with state and local law enforcement, in training,[11] funding,[12] and actual prosecutorial functions is far too close to allow the Attorney General to escape the reality of the office's bias in favor of state prosecutions. Given the consistency of the Attorney General's cooperation with and assistance of state and local law enforcement, and the lack of any similar role with regard to defense counsel, it is again clear that the Attorney General's position is that of a partisan advocate, not a neutral decision maker.

### D. The Attorney General's dual role as prosecutor and adjudicator creates a high probability of actual bias.

The Attorney General's dual role also heightens the risk of actual bias or prejudgment: the certification process in Chapter 154 endows the office with an adjudicative function it must fulfill in combination with its principal prosecutorial function. Combining these dual roles (adjudicative and law enforcement), and mixing them within a single government entity, heightens the risk that the process has compromised structural due process guarantees. Here, the manner in which the Attorney General promulgated regulations about the certification process demonstrates that it

---

[11] For example, the Bureau of Justice Assistance, a division in the Office of Justice Programs under the supervision of the Attorney General, long has provided local and state law enforcement training on a wide variety of topics. *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, National Training and Technical Assistance Center, at https://bjatta.bja.ojp.gov/about (last visited Sept. 25, 2025). The Department of Justice formalized this association by joining with the National District Attorneys Association to create the National Advocacy Center, located on the University of South Carolina campus in Columbia, South Carolina, where training facilities for American prosecutors at all levels—federal, state and local—are concentrated in one facility. *See* https://www.ndaa-apri.org/education/nac_index.html (last visited Sept. 25, 2025). Indeed, the Department of Justice transferred its central training facility for federal prosecutors from Washington, D.C. to the National Advocacy Center.

[12] *See, e.g.*, Grants at https://www.justice.gov/grants (last visited Sept. 25, 2025).

conflated the office's role as an advocate for state prosecutors and states with its role as the adjudicator of State certification applications.

This conflation appears most starkly in the Attorney General's consultation with prosecutors when promulgating the rules for Chapter 154 certification. The Attorney General's August 22, 2017, Memorandum indicated that the office would consult the Capital Case Section of the Criminal Division—a group that assists in the prosecution of federal capital cases and defends against federal capital habeas petitions. *See* Memorandum from Jeff Sessions, Att'y Gen., U.S. Dep't of Justice, to the Acting Ass't. Att'y Gen., Office of Legal Policy (Aug. 22, 2017), https://www.justice.gov/olp/page/file/1003426/download (last visited Sept. 25, 2025). This consultation for the regulations governing the Attorney General's certification decision was particularly troubling because a federal district court had previously found that the Attorney General's consultation with the chief of the DOJ's Capital Case Unit when promulgating an earlier 2007 proposed rule on certification "raise[d] serious questions" about whether the "rule was so tainted by bias that it was not a valid exercise of rulemaking authority." *Habeas Corpus Resource Ctr. v. Dep't of Justice*, 2009 WL 185423 at *9 (N.D. Cal. Jan. 20, 2009). The Attorney General's approach to consultation for the rulemaking on certification suggests that the Attorney General will continue to sacrifice neutrality as the adjudicator and privilege the office's responsibilities as a prosecutor. *See Ford*, 477 U.S. at 416 ("Perhaps the most striking defect in the procedures . . . is the State's placement of the decision wholly within the executive branch. . . . The commander of the State's corps of prosecutors cannot be said to have the neutrality that is necessary for reliability in the factfinding proceeding."). Under these circumstances, the Attorney General's bias is clear.

As the nation's chief law enforcement office, the Attorney General has biased interests, making clear that "because of [its] institutional responsibilities," the office has a "strong [] motive

to rule in a way" that would advance those interests at the expense of adjudicatory neutrality and independence. *Alpha Epsilon Phi Tau Chapter Housing Ass'n*, 114 F.3d at 844 (internal citation omitted). While allowing the Attorney General to make the certification determination under Chapter 154 may not constitute being "a judge in his own case," *In re Murchison*, 349 U.S. 133, 136 (1955), it essentially equates with allowing the office to act a judge in its brother's case and thus violates the principle that "no man is permitted to try cases where he has an interest in the outcome." *Id.*

For these reasons, Plaintiffs have a high likelihood of success on their claim that § 2265 is unconstitutional under the Fifth Amendment to the U.S. Constitution.

### III. Plaintiffs are likely to prevail on the merits of their Article III separation of powers claim.

Chapter 154 contravenes the Constitution's separation of powers doctrine by transferring to the Attorney General the authority to certify jurisdictions that qualify for the application of the fast-track habeas procedures in Chapter 154 to capital habeas cases. Article III of the U.S. Constitution vests the judicial power in the federal courts. Because the federal courts decide cases in which individuals file petitions for writ of habeas corpus, Article III precludes Congress from transferring the certification authority to the Attorney General rather than leaving it with the judiciary. Although Chapter 154 provides an appellate court with jurisdiction to review the Attorney General's certification determination, Article III requires federal courts to make all *habeas*-related determinations in the first instance. By subjecting the plaintiffs to a constitutionally illegitimate proceeding presided over by a constitutionally illegitimate decisionmaker, the certification regime violates their rights and runs afoul of the Constitution's requirement of a separation of powers.

31

### A. The judicial power to decide federal habeas cases belongs exclusively to an independent federal judiciary.

A cornerstone of the U.S. Constitution is its separation of government power into three branches. It vests the "judicial power" in the U.S. Supreme Court and the lower federal courts that Congress has created. U.S. Const. art. III, § 1. To protect that power and maintain the judiciary's independence, the Constitution provides that federal judges have no term limits and cannot have their compensation reduced. *See id.* Through these protections, "the Framers sought to ensure that each judicial decision would be rendered, not with an eye toward currying favor with Congress or the Executive, but rather with the '[c]lear heads . . . and honest hearts' deemed 'essential to good judges.'" *Stern v. Marshall*, 564 U.S. 462, 484 (2011) (quoting 1 Works of James Wilson 363 (J. Andrews ed. 1896)). While "the three branches are not hermetically sealed from one another," *id.* at 483, Article III nevertheless founds "an inseparable element of the constitutional system of checks and balances" that "both defines the power and protects the independence of the Judicial Branch." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (plurality opinion).

The federal courts' Article III judicial power cannot be divided and shared with the other branches of government. According to "'the basic concept of separation of powers . . . [the judicial power] can no more be shared' with another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto.'" *Stern*, 564 U.S. at 483 (quoting *United States v. Nixon*, 418 U.S. 683, 704 (1974) (quoting U.S. Const., Art. III, § 1)). The "judicial power" consists of the powers to decide federal law questions arising under the court's jurisdiction independently, finally, and effectually. *See, e.g.*, *Crowell v. Benson*, 285 U.S. 22, 60 (1932); *see generally* James S. Liebman & William F. Ryan, *"Some Effectual Power": The Quantity and Quality of Decisionmaking*

*Required of Article III Courts*, 98 Colum. L. Rev. 696 (1998). Article III thus prohibits Congress from encroaching on the power of federal courts by delegating their authority to legislative or executive entities. *See Stern*, 564 U.S. at 484 ("Article III could neither serve its purpose in the system of checks and balances nor preserve the integrity of judicial decision making if the other branches of the Federal Government could confer the Government's 'judicial Power' on entities outside Article III.").

While Congress can and has lawfully conferred quasi-judicial authority to administrative agencies and non-Article III courts in some circumstances, those instances demonstrate why a similar assignment of power is inappropriate in the federal habeas context. The U.S. Supreme Court has analyzed various factors to determine whether a congressional action runs afoul of Article III: "the extent to which the 'essential attributes of judicial power' are reserved to Article III courts, . . . the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from the requirements of Article III." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) (holding that the Commission's jurisdiction over common law counterclaims did not violate Article III); *see also Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 594 (1985) (holding Congress's binding arbitration scheme under the Federal Insecticide, Fungicide, and Rodenticide Act was valid use of its Article I powers). These cases underscore the difference between statutorily created rights and constitutional rights. When Congress funnels constitutionally based claims—like those made in accordance with the Great Writ[13]—to executive or legislative bodies, these "substantial inroads into functions that have

---

[13] The writ of habeas corpus—though codified by statute—is "antecedent to statute, throwing its root deep into the genius of our common law." *Rasul v. Bush*, 542 U.S. 466, 473 (2004) (internal

traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created." *Northern Pipeline Construction v Marathon Pipeline.,* 458 U.S. 50, 84 (1982) (plurality opinion). Instead, "such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts." *Id.*

Federal habeas review resides at the heart of the power reserved to Article III courts. In the Founding era, Chief Justice John Marshall—author of *Marbury v. Madison*—declared that habeas is a "great constitutional privilege." *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807). Its special status was apparent from the beginning; the Constitution provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9. Indeed, habeas made the list of national rights protected under the Fourteenth Amendment's Privileges and Immunities Clause. *See The Slaughter-House Cases*, 83 U.S. (16 Wall.) 394, 409 (1873). Congress, during the Reconstruction, gave state prisoners the constitutional privilege of plenary federal habeas review of allegedly unconstitutional detention.[14] Legal and other sources show that "the right . . . to claim the benefit

---

quotations omitted). It is "an integral part of our common-law heritage." *Id.* (internal quotations omitted).

[14] *See* Act of Feb. 5, 1867, 2nd Sess., ch. 28, §1, 14 Stat. 385, 385-86; *Slaughter-House Cases*, 83 U.S. 36, 69 (1872) (citing *In re Turner*, 24 F. Cas. 337 (C.C.D. Md. 1867)); *see also Ex parte Yerger*, 75 U.S. (8 Wall.) 85, 101-02 (1868); *Ex parte Royall*, 117 U.S. 241, 247-48 (1886); *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 128-29 (2020); *Lehman v. Lycoming Cnty. Child.'s Servs. Agency*, 458 U.S. 502, 518 n.3 (1982) (Blackmun, J., dissenting); *Griffin's Case*, 11 F. Cas. 7, 23-24 (C.C.D. Va. 1869) (Chase, C.J.); Anthony G. Amsterdam, *Criminal Prosecutions Affecting Federally Guaranteed Civil Rights: Federal Removal and Habeas Corpus Jurisdiction to Abort State Court Trial*, 113 U. Pa. L. Rev. 793, 886 (1965) (federal courts "viewed the 1867

of the writ of habeas corpus," *Corfield v. Coryell*, 6 F. Cas. 546, 552 (C.C.E.D. Pa. 1823), stands among the "rights of the citizen guaranteed by the Federal Constitution." *Slaughter-House*, 83 U.S. at 79 (citing *Corfield*). Congress passed the Habeas Corpus Act of 1867 (HCA) with the understanding that such legislation would define the habeas privilege protected by the Suspension Clause. *See, e.g.*, *Ex parte Yerger*, 75 U.S. 85, 101-02 (1868); *Ex parte Royall*, 117 U.S. 241, 247-48 (1886); *Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 95 (1807). The individual right to habeas corpus thus possesses the "origins and importance" undeniably subject to the core, indivisible judicial power.

Once Congress grants the federal courts jurisdiction—as it has in the federal habeas context—it cannot encroach on the judiciary's power to interpret the law and decide the cases and controversies before it. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (declaring that "[w]hen the Court has interpreted the Constitution, it has acted within the province of the Judicial Branch, which embraces the duty to say what the law is" and any contrary expectations from the legislative branch "must be disappointed"); *Lindh v. Murphy*, 96 F.3d 856, 872 (7th Cir. 1996) (en banc) ("Once the judicial power is brought to bear by the presentation of a justiciable case or controversy within a statutory grant of jurisdiction, the federal courts' independent interpretive authority cannot be constitutionally impaired."). Chapter 154 contravenes the constitutional requirement of separation of powers by granting the Attorney General the power to make certification determinations in the first instance, in a context at once divorced from any individual habeas petition but purported governing of all in the certified jurisdiction. The question is

---

statute as imperatively demanding federal discharge of state prisoners held for trial or after state trial-court conviction, notwithstanding the availability of still unexhausted state remedies") (cited in *State of Ga. v. Rachel*, 384 U.S. 780, 786 n.4 (1966), as "a remarkably original and comprehensive discussion of the issues").

ultimately whether Congress's action represents an "encroachment or aggrandizement of one branch at the expense of the other." *United States v. Johnston*, 258 F.3d 361, 367 (5th Cir. 2001) (quoting *Schor*, 106 S.Ct. at 3256 (citations and internal quotation marks omitted)). As shown, the answer is yes.

### B. Section 2265 transfers judicial decision making from federal courts to the Attorney General in violation of Article III.

The Attorney General's role in certification compromises the structural guarantee that federal courts will hold the judicial power. Under Chapter 154, the Attorney General's certification determination carries a compulsory effect. *See* 28 U.S.C. § 2261(b)(1). The Attorney General maintains that federal district courts reviewing habeas petitions do not weigh in on the certification; instead they only apply the statutory criteria asking whether "counsel was appointed pursuant to that [state post-conviction] mechanism, petitioner validly waived counsel, petitioner retained counsel, or petitioner was found not to be indigent." 28 U.S.C. § 2261(b)(2); *see* Certification Process for State Capital Counsel System, 78 Fed. Reg.at 58162. In other words, on the question of certification, the Attorney General seeks to tie the hands of Article III courts. *See* The Attorney Gen.'s Auth. in Certifying Whether A State Has Satisfied the Requirements for Appointment of Competent Counsel for Purposes of Capital Conviction Review Proceedings, 2009 WL 7513855, at *6 (O.L.C. Dec. 16, 2009) ("Similarly, the amended law unambiguously requires the federal habeas courts to give effect to the Attorney General's certification determinations. . . . [S]ection 2261(b)(1) [] expressly requires courts to accept the Attorney General's certification under section 2265(a)(1)(A) in determining whether the expedited procedures apply."). The scheme Congress adopted here thus encroaches on Article III. Congress seeks to diminish and divide Article III power and endow it in the Attorney General. Chapter 154 thus improperly

aggrandizes the executive branch at the expense of the judicial branch. *See Johnston*, 258 F.3d at 367.

Further, the 2006 amendment's provision for judicial review of the Attorney General's determination offers no cure. Important features differentiate the facially unconstitutional certification regime from other statutes that have been deemed legitimate. The scheme carries none of the hallmarks of judicial control that have justified previous reallocations of judicial power. Several cases arising under the Federal Magistrates Act establish the principle that magistrates can perform some judicial functions because "the magistrate acts subsidiary to and only in aid of the district court" and "the entire process takes place under the district court's total control and jurisdiction." *United States v. Raddatz*, 447 U.S. 667 (1980); *see also Peretz v. United States*, 501 U.S. 923, 937 (1991) (finding that "there is no danger that use of the magistrate involves a congressional attemp[t] to transfer jurisdiction [to non-Article III tribunals] for the purpose of emasculating constitutional courts" (internal quotations omitted)).

Here, however, the Attorney General possesses the sole authority to determine in the first instance whether a state is certified. *See* 28 U.S.C. § 2265(a)(1). The Attorney General's office also creates its own regulations to govern the certification process. *See* 28 U.S.C. § 2265(b) ("The Attorney General shall promulgate regulations to implement the certification procedure under subsection (a)."); 28 C.F.R. §§ capital case section-26.23 (relevant regulations). Most importantly, the Attorney General alone decides what information is required from a State to make a certification decision. Unlike a magistrate, the Attorney General is not "subsidiary to" or "only in aid of" the judiciary. Instead, the Attorney General is fully independent of the courts, like an administrative agency.

One additional feature of the judicial review process further demonstrates the Article III violation. Whereas magistrates' recommendations are passed along to federal district court judges for consideration, the Chapter 154 procedure altogether bypasses the district courts. In vesting "exclusive jurisdiction" for judicial review of certification determinations in the Court of Appeals for the D.C. Circuit, the statute thwarts the normal structure and operation of judicial review. Rather than respecting the role that federal district courts play in deciding habeas petitions, Chapter 154 transfers basic judicial power to the Attorney General and limits judicial review to the Court of Appeals for the D.C. Circuit by requiring that court to answer the general question whether a state's mechanism for postconviction representation qualifies the jurisdiction for opt-in. Although the Court of Appeals may engage in *de novo* review, it is detached from the individual federal habeas petition of the Plaintiffs (or any other individual). The district court bypass is another method the statute adopts to diminish judicial influence in habeas litigation.

While the U.S. Supreme Court has found that magistrates can perform many functions typically performed by Article III judges, it has insisted that Article III judges must preside over all dispositive matters adjudicated within a federal case or controversy. *See United States v. Raddatz*, 447 U.S. 667, 673 (1980) (non-Article III magistrate "has no authority to make a final and binding disposition" on dispositive motions). The prohibitions on the authority of a magistrate to make dispositive rulings in a proceeding are instructive; the constitutional concerns they address are less pressing than those raised by the Attorney General's certification power because the judiciary controls its magistrates. In contrast, the certification regime produces immediate harms that can only be repaired by restoring judicial power in the Article III federal district courts conducting habeas review. The judicial review provided does not address the way in which Chapter 154 violates the structural guarantees made by Article III.

38

The legislative history of the Reauthorization Act further demonstrates a separation of powers violation. According to the test the Supreme Court articulated in *Schor*, "the concerns that drove Congress to depart from the requirements of Article III" help determine whether an Article III violation occurred. 478 U.S. at 851. Remarkably, the premise of the amendment that undertook to grant the Attorney General the authority to certify jurisdictions for opt-in was that the judiciary was partial and operated under a "conflict of interest." 151 Cong. Rec. E2640 (daily ed. Dec. 22, 2005) (extended remarks of Rep. Flake). On this theory, the expedited procedures' imposition of strict time limits upon the judiciary rendered the judiciary unable to fairly decide whether a jurisdiction should be certified. *See id.*; *see also* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). For this reason, elected representatives who were transparently frustrated with judicial determinations that their states did not meet Chapter 154 requirements decided that a "neutral party"—the Attorney General—should decide. *See* 152 Cong. Rec. S1620 (daily ed. Mar. 2, 2006) (statement of Sen. Kyl). If ever the concerns that drove Congress to diminish the judiciary's power would implicate separation-of-powers issues, this is the scenario. *See United States v. Will*, 449 U.S. 200, 217–18 (1980) ("A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government."). The legislative branch infringed upon the judicial branch's authority because it disagreed with the courts' conclusions and questioned their ability to exercise power impartially.

The Constitution seeks to protect individuals (and our government) from the types of structural incursions that prevent the judiciary from independently resolving cases and controversies. The Supreme Court has explained that "our Constitution unambiguously enunciates a fundamental principle—that the 'judicial Power of the United States' must be reposed in an

independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence." *Northern Pipeline*, 458 U.S. at 60 (plurality). The power is sacrosanct in the context of private rights to liberty, including habeas corpus. *Sec. & Exch. Comm'n v. Jarkesy*, 603 U.S. 109, 127–28 (2024) ("we have repeatedly explained that matters concerning private rights may not be removed from Article III courts").[15] In diminishing the judicial power in the habeas context and transferring the certification authority to the Attorney General, Congress disregarded the constitutional command. This Court must enforce it.

For these reasons, this Court must strike down as unconstitutional the statutory provisions that empower the Attorney General at the judiciary's expense.

### C. The provision for *De Novo* Court of Appeals review offers no cure for Chapter 154's constitutional infirmities.

The review provisions of Chapter 154, codified at 28 U.S.C. §§ 2265(c), provide that "The determination by the Attorney General regarding whether to certify a State under this section is subject to review exclusively as provided under chapter 158 of this title," and also provide that review is *de novo* in the Court of Appeals for the District of Columbia. Chapter 158, known as the Hobbs Act, gives courts of appeals the "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of" certain agency decisions. Chapter 154 added the

---

[15] Habeas corpus protects the private right to liberty—freedom from unlawful restraint—which is a classic example of a private right in Article III terms. *See, e.g.*, *I.N.S. v. St. Cyr*, 533 U.S. 289, 305 (2001) ("The writ of habeas corpus has always been available to review the legality of Executive detention."); *Boumediene v. Bush*, 553 U.S. 723, 743, (2008) (observing "the Framers considered the writ a vital instrument for the protection of individual liberty," which was made "evident from the care taken to specify the limited grounds for its suspension"). For a further discussion, *see* John M. Golden & Thomas H. Lee, *Article III, the Bill of Rights, and Administrative Adjudication*, 92 Fordham L. Rev. 397, 411 (2023) (discussing the likelihood that habeas corpus review must be considered a core Article III judicial function).

Attorney General's certification decision to the list of agency determinations that the Hobbs Act governs. Adding to the Hobbs Act's spheres of jurisdiction, however, cannot repair the constitutional flaws introduced with the transfer of certification authority to the Attorney General.

First, the Court of Appeals, of necessity, can only make an abstract determination about a state mechanism divorced from any one case, informed only by the advocacy of entities or individuals who may come forward at the place and time of certification. It is unfair—and could violate due process—to bind a future habeas petitioner, who has never had an opportunity to be heard on the adequacy of a state's mechanism, to limitations on habeas review that include a statute of limitations of half the length it would otherwise have.

The Supreme Court recently reached a similar conclusion in a Hobbs Act case. *See McLaughlin Chiropractic Associates, Inc. v. McKesson Corporation*, 606 U.S. 146 (2025). There, the Court considered whether an FCC determination that an online fax service did not come within the definition of a fax machine bound a district court in a private enforcement action. The Court said no, in part because it would be unfair, and possibly violate due process, to bind a later plaintiff who has never had an opportunity to be heard. *Id.* at 159. n.5 ("Barring defendants in enforcement actions from raising arguments about the legality of agency rules or orders enforced against them raises significant questions under the Due Process Clause—especially for parties that did not exist or had no good or reasonably foreseeable reason to sue when the agency rule or order was first issued."); s*ee also Verizon Communications Inc. v. Federal Communications Commission*, ___ F.4th ___, 2025 WL 2609127 (Sept. 10, 2025) (following *McLaughlin*).

Second, the abstract determination of the Court of Appeals cannot take the place of a district habeas court's appropriate determination whether to grant equitable tolling of Chapter 154's curtailed statute of limitations. The habeas court has the authority to determine, even *sua*

*sponte*, whether the petition complies with the statute of limitations, *see Day*, 547 US at 209-10, and the obligation to determine whether equitable tolling applies. *See Holland v. Florida*, 560 U.S. 631, 645-46 (2010). An individual habeas petitioner has the right under Article III to a district court determination whether it should equitably toll the Chapter 154 limitations period because of the inadequate state postconviction mechanism, the Attorney General's biased certification decision, the unfairness of applying the state's mechanism to the petitioner retrospectively, likely years after judgment and sentence, and any other equitable factors. The D.C. Circuit's one-time abstract review of the mechanism for the state as a whole, divorced from its application in any specific case, cannot provide the equitable determination each habeas petitioner should receive.

For these reasons, review of the Attorney General's certification decision offers no remedy to the statute's encroachment on the Article III powers of habeas courts.

## IV. Plaintiffs are likely to prevail on the merits of their claim that § 2265 violates the Due Process Clause and the separation of power doctrine under Article III when these constitutional provisions are considered together.

While the violations of the Due Process Clause and the separation of powers doctrine under Article III, standing alone, requires this court to declare 28 U.S.C. § 2265 unconstitutional, considered together, the constitutional infirmities aggrandize the Attorney General's power in a manner that flouts the protections and structure of the Constitution. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 881 (1990), *superseded by statute*, 42 U.S.C. § 2000bb et seq. (recognizing prior decisions where conduct was found to be a constitutional violation when constitutional protections were viewed in connection with one another (citing cases)).

As described above, § 2265 both encroaches on Article III judicial authority through the transfer of judicial authority to the Attorney General and simultaneously places the Plaintiffs before an unconstitutionally biased decision maker. This aggrandizement of power allows the

Attorney General to hide behind the aggregate nature of the decision to interfere with the decision making of federal district courts in habeas review. The connection between the violations of the Due Process Clause and Article III contravene the Constitution's most fundamental protection of life and liberty against the tyranny of the executive. Nowhere are these concerns more heightened than when the state seeks to take an individual's life and where the judicial review at issue is that under the Great Writ.

**V.    Plaintiffs have suffered and will continue to suffer irreparable harm.**

Plaintiffs establish irreparable harm when they show an injury "both certain and great[,] actual and not theoretical[,]" and so imminent "that there is a clear and present need for equitable relief." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 202 (D.D.C. 2017) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

Here, the Plaintiffs' only opportunity to demonstrate the illegitimacy of Tennessee's certification application—a determination that will greatly impact their access to habeas review— is to engage in an illegitimate administrative process before an illegitimate agency decision maker, which constitutes a "here-and-now" injury. *Axon*, 598 U.S. at 191. Further, Plaintiffs' concerns are not speculative. As experience has shown with the efforts by Arizona and Texas to seek certification, and the measures taken by the federal capital and state postconviction defenders in those states to counter the applications, Plaintiffs, though their defense counsel, may face years of administrative proceedings and litigation to pursue their right to constitutional federal habeas review procedures and challenge Tennessee's assertion that it is entitled to apply the fast track procedures under Chapter 154. Plaintiffs may endure this ongoing burden, only to succeed much later in their collateral challenges to the constitutionality of the framework of § 2265.

Unlike other harms that can be corrected by federal courts after an illegitimate proceeding ends, this harm "has already happened [and] cannot be undone" and "[j]udicial review . . . would

43

come too late to be meaningful." *Axon*, 598 U.S. at 191. Plaintiffs therefore need a TRO *before* having to continue with the Attorney General's certification process, which will in turn determine the procedures applicable to their federal habeas review. The Plaintiffs' coerced engagement with Attorney General's administrative decision making for Tennessee's certification constitutes an ongoing, irreparable harm that supports granting Petitioners an TRO.

**VI.    The balance of equities and public interest favor granting a temporary restraining order.**

In cases against the government, courts can consider the balance of equities and the public interest together. *See Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Where the government's actions violate the Constitution and subject plaintiffs to irreparable harm, both the equities and the public interest weigh in plaintiffs' favor. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C. 2012) (quotation marks and citations omitted); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (same) (citations omitted).

Here, the balance of equities and public policy favor enjoining the Attorney General's certification determination. As to the equities, the Attorney General will suffer little to no inequity from a pause in the administrative determination. Unlike the Attorney General's pro-prosecution bias and legal interest in the standards for adequate defense counsel, the office has no direct stake in Tennessee's overall defense of habeas petitions. Further, federal habeas review will continue under well-established existing procedures and legal standards in § 2254 of Title 28. Any possible inequity on behalf of the Attorney General also pales in comparison to the unfairness of coercing the Plaintiffs——indigent individuals sentenced to death and their counsel—into exhausting an administrative process that lacks even a façade of fairness.

44

Finally, it is well-established that there is no public interest in allowing an unconstitutional government process to continue. As described in this Memorandum, the transfer of decision-making authority under § 2265 for state certification applications from the federal district courts to the Attorney General, on its face, violates the Due Process Clause, Article III, and the doctrine of separation of powers under Article III. It deprives the Plaintiffs of a neutral and disinterested decision maker to determine Tennessee's eligibility to assert truncated and expedited procedures for their federal habeas review. The equities and public interests align on the Plaintiffs' side, with no valid interests on the Defendants' side. This factor favors granting the Plaintiffs a TRO.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant the Motion for a Temporary Restraining Order. A proposed Order is attached.

Dated: September 30, 2025                                    Respectfully submitted


                                                            /s/_____

Gitanjali S. Gutierrez, N.Y. 4183935*           Maria V. Morris, D.C. 1697904
Claudia Van Wyk, P.A. 95130*                    **ACLU FOUNDATION**
**ACLU FOUNDATION**                              915 15th Street, N.W.
201 W. Main St., Ste. 402                        Washington, D.C. 20005
Durham, N.C. 27701                               Tel: 202-393-4930
Tel: 919-682-5659                                mmorris@aclu.org
ggutierrez@aclu.org
cvanwyk@aclu.org


*Pro hac vice application forthcoming.*

*Attorneys for Plaintiffs*


45